142   187
144    17
142   187
82a-471
142   187
92a ⁹140

SCUDDER *et al.*, *Executors of* HENRY AMES, v. LUCY
    V. S. AMES, *Administratrix of* EDGAR AMES,
                        *Appellant.*

### In Banc, December 23, 1897.

1. **Administration:** COMMISSIONS. The decedent, with two others,
was a surety on the bond of a contractor who had contracted with the
county to build an insane asylum, and on his failure to perform, the
decedent paid the county .$5,029.13, and the sureties proceeded to
complete the building, and presented a petition to the county court ask-
ing to be reimbursed for the money expended. The court, after many
years, settled their claim by allowing them $10,000. Twenty days after
this allowance was made, one Watts agreed with decedent's adminis-
tratrix that he would collect her share for twenty-five per cent of the
amount collected. He collected and paid to the administratrix
$3,333.35, or one third of the allowance, and she paid him his commis-
sion of twenty-five per cent or $833.33, and the administratrix asked
that she might be credited with this sum in her settlement. *Held,*
that Watts did not collect the money, but only received the money
and paid it over to the administratrix, *and* that it was the duty of the
administratrix to collect the money, compensation for such services
being allowed her by law in the way of commissions.

2. ————: TRUSTS AND INDIVIDUAL INTERESTS: PREFERENCE. In case of
conflict as to whether certain payments should be charged to the
partnership estate or to the individual estate of the surviving part-
ner, who is administrator, the trust estate should be preferred.

3. ————: CUSTOM AMONG PARTNERS AS TO PERSONAL EXPENSES. By a
custom among partners, each had used what money he pleased for
individual purposes, and at the end of the fiscal years the amounts
drawn out by each, however widely different, were charged to the
expense account of the firm. One partner died, and the survivor,
having qualified as the administrator of the partnership estate, drew
out of the firm's assets an amount which made his individual account
for the year equal to that of the decedent. *Held,* that such survivor
had no right to thus equalize the individual expenses of each, and that
the amount he drew out should have remained as a part of the part-
nership assets, such a custom of charging amounts drawn out by the
individual partners, to the firm's expenses, if long continued, becom-
ing engrafted onto the partnership's contract as a part thereof.

4. ———: INTEREST ON OMITTED ASSETS. Interest ought not to be charged the administrator on assets omitted from the inventory but used for the benefit of the estate, the proceeds of which were turned into the estate as soon as they were turned into money.

5. ———: FOREIGN ASSETS: RIGHTS AND LIABILITIES OF SURVIVING PARTNER. The surviving partner has the right at common law to convert the firm's assets in another State into money in the usual course of business and to apply the proceeds to the payment of the partnership debts, and the appointment of the survivor administrator by the courts of this State confers on him no jurisdiction over such assets, and imposes on him no duty to account for them in his official capacity until the proceeds are brought into this State.

6. ———: ATTORNEY'S FEE. Where the referee and the circuit court agree upon the allowance of an attorney's fee, and there appears nothing unfair or inequitable about the same, the Supreme Court will not interfere.

7. ———: APPEALS: RES ADJUDICATA. When certain items in a final settlement have been reviewed by this court, and the cause remanded for a new hearing, and an appeal again taken, the decision of the court on such items will be held to be *res adjudicata* unless at the rehearing new evidence concerning the same was introduced.

8. ———: SALE OF GOOD WILL OF PARTNERSHIP. The surviving partner inventoried the tangible assets of the firm, but carried on the business in the firm's name to his own use, thus appropriating its good will without accounting to the firm for its value. *Held*, that under the circumstances of this case, the good will, subject to the rights of the surviving partner, was of no appreciable value.

9. ———: PAYMENT OF ILLEGAL TAXES. The administrator paid $330.91 in taxes claimed by the city against the partnership under an ordinance which the Supreme Court afterward, in an entirely different case, held to be void. *Held*, that the measure of the administrator's duty is the exercise of that degree of care which cautious persons employ in their own business, and under the circumstances in this case he was not chargeable for the payment of the taxes.

10. ———: TECHNICAL OBJECTIONS. Partners in their lifetime made a warranty deed to land. Afterward a cloud arose on the title, and the administrator paid $333.64 out of the partnership estate to remove the same, to which objection was made on the ground that the payment should have been made out of the separate funds of the individual estates of the partners. *Held*, that as the objection is purely technical, the ruling will not be disturbed.

11. ———: FAILURE TO PROSECUTE CLAIMS. The administratrix of a surviving partner ought not to be charged with a claim for cotton which had been seized by government authorities in time of war when she was advised by the partnership's lawyers that the claim was worthless, although a confidential agent of the partners, who held a power of attorney from them, afterward recovered the amount of the claim, which fact did not become known to the administratrix until after such agent was insolvent. Nor should she be charged with a claim for other cotton so seized, when a suit in replevin, begun by the partners in their lifetime, was lost in a United States circuit court, which decision on appeal to the United States Supreme Court was affirmed after their death, and her attorneys had advised her that the matter was at an end, even though the claim was afterward paid to a creditor of the partnership's agent in whose name the claim was begun, such creditor having prosecuted the suit through the court of claims for his own benefit, without the knowledge of the administratrix.

12. ———: ATTORNEY'S FEES. Reasonable attorney's fees, paid by the administratrix of a surviving partner, who was the administrator of the partnership, in the protracted litigation over the settlement of the partnership estate, are properly chargeable to that estate.

*Appeal from St. Louis City Circuit Court.*—HON. D. D. FISHER, Judge.

REMANDED (*with directions*).

*Boyle & Adams* and *George W. Lubke* for appellants.

(1) The partnership estate having received from Edgar Ames during his lifetime, on account of the partnership assets at Vicksburg on August 14, 1866, the sum of $39,523.61, such sum should be deducted from whatever amount is found to have been realized from the assets, and the administratrix should be required to account for and pay to the partnership estate only the balance remaining of the amount so realized after such deduction is made. (2) The administra-

trix is entitled to have the sum of $833.33 deducted from the charge against her of $3,323.33 as having been realized on the Dennis Fitzpatrick claim, because this sum was a reasonable and necessary expense attending the collection of the amount realized. (3) The advancements made by Edgar Ames to Turley, Burney, Nichols and Porter after the death of Henry Ames should be repaid to him before any amounts collected from said parties should be applied to indebtedness due by these parties to the firm of Henry Ames & Company prior to Henry Ames' death: *First*. Because the subsequent advancements were made in pursuance of a previous agreement by the firm of Henry Ames & Company that they should be made; and *second*, because they were made in good faith for the purpose of securing the collection of the indebtedness of these parties due to Henry Ames & Company at the time of Henry Ames' death; and hence should be first repaid as expenses legitimately incurred in collection of such indebtedness. (4) The withdrawal of Edgar Ames out of the partnership funds for his individual use of a sum which would make the entire amount so withdrawn by him equal to the amount which Henry Ames had withdrawn during the year of his death for his individual use was warranted, for the reasons: *First*. That they were equal partners in the business; *second*, that it was understood between them at the beginning of the year that neither should withdraw for his own use more than the other. (5) The charge against the administratrix of interest for four years on the value of the stock of goods and money on hand at Vicksburg at the time Henry Ames died, is without warrant in law. (6) The credits taken by the administratrix for amounts paid to the Revenue Collector as United States income tax for the years 1868 and 1869 should have

Scudder v. Ames.        .

been allowed: *First.* Because under the Income Tax law she was required to make return of the income of the estate in her hands as such administratrix and to pay the. tax thereon; *second,* because said amounts were paid under demand and threat of the United States collector, and upon advice and direction, given in good faith, of counsel learned in the law; and were paid for the purpose of avoiding additional expense and penalty imposed by the law for the failure to pay the same. (7) The full amount of expenses incurred by the administratrix for attorneys' fees and other costs and expenses attending the litigation over the administration accounts should have been allowed to her, for the reasons: *First.* That such expenses are shown to have been reasonable and necessary. *Second.* That such expenses were incurred in good faith for the purpose of reaching a final settlement of the exceptions filed thereto by the executors of Henry Ames and which are shown in part to have been without warrant in law or fact, and, as to such part as has been sustained, it is shown they were so involved in doubt and uncertainty as to justify a refusal to acquiesce in them until a judicial determination of them had been secured. (8) The administratrix is entitled under the law to commission as well on the amount of commissions disbursed to her as upon amounts disbursed for other purposes, for the reason that the commission of five per cent is not limited to disbursements as such, but is allowed by express provision of statute on all "personal property, and on money arising from the sale of real estate." (R. S. 1889, sec. 222.)

*James O. Broadhead, Douglas & Scudder* and *Campbell & Ryan* for exceptor. and respondent.

(1) The court committed no error in charging the administratrix with the $10,147.73 withdrawn by

Edgar Ames from the partnership assets in order to equalize the sum withdrawn by him in that year with the amount withdrawn by Henry Ames prior to his death. The administratrix, in making settlement for Edgar Ames, should have charged him with that amount. *Scudder v. Ames*, 89 Mo. 496; *Geddes v. Wallace*, 2 Bligh, 270; *Const v. Harris*, T. & R. 523; *Winchester v. Glazier*, 152 Mass. 316; Lindley on Partnership [Ewell's Ed.], 408; *Gaslight Co. v. St. Louis*, 46 Mo. 121; *Chicago v. Sheldon*, 9 Wall. 50. (2) The court committed no error in charging the administratrix with the amount paid by her as United States income tax, there being no law imposing an income tax upon an estate in process of administration. 13 U. S. Stat. at Large, p. 282, sec. 118; *Ib.* (Amendment), p. 480; *Mandell v. Pierce*, 3 Cliff. 134; *In re Peyser*, 5 Dem. 244. An administrator can not justify an illegal and improper disbursement of the funds of an estate in his charge by plea that it was done by advice of counsel. *Doyle v. Blake*, 2 Sch. & Lef. 243; *Peers v. Ceeley*, 15 Beav. 209; *In re Knight's Trusts*, 27 Beav. 49; *Devey v. Thornton*, 9 Hare, 222; *Boulton v. Beard*, 3 DeG. M. & G. 608. (3) The court committed no error in refusing to allow the credit claimed by the administratrix for commissions upon a sum of money which never came to her hands. G. S. 1865, p. 506, sec. 9; *Scudder v. Ames*, 89 Mo. 512; *Hitchcock v. Mosher*, 106 Mo. 578. (4) The court committed no error in refusing to allow the credit claimed by the administratrix for commissions for the collection of rents. *Scudder v. Ames*, 89 Mo. 511. (5) The court committed no error in charging the administratrix with the amount received by her as the "Fitzpatrick account." Where an administrator procures an order to sell an asset of an estate in his charge upon his representation to the court that such asset is uncollectible and upon

such sale buys the asset himself and procures the sale to be approved, though in the meantime he has learned that such asset is good, he will nevertheless be charged in his accounts with the estate with the value of such asset. *Cadwalader's Appeal*, 64 Pa. St. 293; *Dundas's Appeal*, *Ib*. 325; *Tennant v. Trenchard*, L. R. 4 Ch. Ap. 537. (6) In a trial *de novo*, such as is provided for by the statutes of Missouri in case of appeal from probate, the whole case is to be tried anew, and the judgment of the probate court is not to be considered. R. S. 1879, sec. 299; *In re Weatherhead*, 53 Vt. 653; *Evans v. Taylor*, 28 W. Va. 184; *Paine v. Cowdin*, 17 Pick. 142; *Earle v. Hart*, 89 Mo. 263. In an appeal from the probate court on a final settlement, the administrator occupies the position of plaintiff, and the case to be tried is that made by the settlement. *Emmons v. Gordon*, 125 Mo. 636; *Tell Furniture Co. v. Stiles*, 60 Miss. 849; *Pettingill v. Pettingill*, 64 Me. 350; *In re Sanderson*, 74 Cal. 199; *Heward v. Slagle*, 52 Ill. 336; *In re Est. of Meeker*, 45 Mo. App. 195; *House v. Duncan*, 50 Mo. 453; *Turner v. Northcutt*, 9 Mo. 249; *Philips v. Bliss*, 32 Mo. 427; *Compton v. Parsons*, 76 Mo. 455; *Crispen v. Hanovan*, 86 Mo. 160; *Needles v. Burk*, 98 Mo. 474. (7) The court erred in allowing the administratrix to take credit in her settlement for the account of Garrard, Sells & Company, $523,819.51, and the account of Garrard & Craig, $50,000, as being no "assets in fact," when the proof showed that such items had been put in the inventory as a cover for other assets, which other assets were not accounted for. *Williams v. Petticrew*, 62 Mo. 461; *Julian v. Abbott*, 73 Mo. 580; *Booker v. Armstrong*, 93 Mo. 49. (8) The court erred in allowing the administratrix to take credit for any amount on account of alleged depreciation below cost price of goods belonging to

the partnership estate which Edgar Ames individually bought for himself as surviving partner without having them inventoried or appraised. 1 Story's Eq. Jur., p. 328; Bispham on Eq. [5 Ed.], sec. 94. (9) In settlement of the Burney account the administratrix took real estate in Louisiana. She took the title in her own name, gave away a portion of the land and laid out a town on the remainder, all without any authority from the probate court. After the settlement of this account she reported it to the probate court as uncollected and uncollectible, procured an order of sale, and bought it herself; the sale, however, was not approved. Having so settled the account, she should be charged with the amount thereof just as if she had received it in money. 2 Williams on Executors, 1898; *Weir v. Tate*, 4 Ired. Eq. 264; *Brownlee v. Lockwood*, 20 N. J. Eq. 239; *Chandler v. Stevenson*, 68 Mo. 453. (10) The court erred in allowing the administratrix to take credit for the notes belonging to the partnership estate shown in the Webb Exhibits without requiring her to show that she used diligence in endeavoring to collect them, and that they are uncollectible, and without requiring her to produce the notes as vouchers. (11) The court erred in refusing to charge the administratrix with the value of the good will of Henry Ames & Company which was appropriated by Edgar Ames, she having failed to charge him therewith in the settlement made by her of his administration of the partnership estate. Story on Partnership, sec. 99; *Boon v. Moss*, 70 N. Y. 473; *Churton v. Douglas*, Johnson, p. 188; *Smith v. Everett*, 27 Beav. 446; *Case v. Abeel*, 1 Paige, 393; *Dougherty v. Van Nostrand*, 1 Hoff. Ch. 68; *Holden's Admr's v. McMakin*, 1 Parsons' Select Cas. 270; *Binninger v. Clark*, 60 Barb. 113; *Rammelsberger v. Mitchell*, 29 Ohio St. 22; *Sheppard v. Boggs*, 9 Neb. 257; *Remick v. Emig*, 42 Ill. 348; *Martin v. Van*

*Schaick*, 4 Paige, 478; *Davis v. Gray*, 14 Wall. 218; *Jackson v. DeForest*, 14 How. Pr. 83; *Brass & Iron Wks. Co. v. Payne*, 19 L. R. A. 82. (12) The court erred in refusing to charge the administratrix with the sum of $857.80, money of the partnership estate, taken therefrom by this administratrix and given to the estate of Edgar Ames as interest on the moneys of the partnership estate advanced by Edgar Ames to the estate of Henry Ames. (13) The court erred in finding "that the estate of Henry Ames, deceased, is indebted to the said partnership estate of Henry Ames & Company in the sum of $5,394.77, being interest at the rate of six per cent per annum on the sum of $29,815.08, advanced and paid to said estate of Henry Ames, deceased, out of the funds of said partnership estate and during the life of Edgar Ames," when in point of fact the sum advanced and paid as above stated was not the sum of $29,815.08, but a much smaller sum. (14) The court erred in refusing to charge the administratrix with such amount as was lost to the partnership estate by reason of her alleged abandonment of its interest in the Elger Cotton. 2 Woerner's Law of Adm., p. 677. (15) The court erred in allowing the administratrix for $330.91 paid on special tax bills issued under a city ordinance which had been declared by the courts to be invalid prior to the payment. Such payment was voluntary and gratuitous and comes under the same rule as the United States income tax, *supra*. (16) Where the administratrix, or the estate of Edgar Ames in her charge, has had the use of money of the partnership estate, she and it are presumed to have earned legal interest, at least, thereon, and she must account to the partnership estate therefor. (17) For all money of the partnership estate that the administratrix kept on deposit in bank to her own credit she should pay interest. Perry on Trusts, sec. 468;

Lewin on Trusts, 312; *Clyce v. Anderson*, 49 Mo. 4; *Houts v. Shepherd*, 79 Mo. 141; *Cruce v. Cruce*, 31 Mo. 676; *Hook v. Payne*, 14 Wall. 252.

BRACE, J.—On the fourteenth day of August, 1866, Henry Ames died, leaving a will by which his brother, Edgar Ames, was made executor; and in the event of his death, John A. and William H. Scudder were to become executors thereof. For many years prior thereto, the brothers, Henry and Edgar Ames, as equal partners, had been engaged in the pork packing and commission business in the city of St. Louis. The profits of their business were not divided, but invested in real estate, stocks, bonds and ventures of various kinds, all going into the partnership account. Among these ventures was that of buying cotton within the Confederate lines during the latter part of the civil war, in which they employed J. J. Garrard, Miles Sells and Alpheus Lewis, who were sent south to make purchases of cotton for them, under an arrangement whereby Ames & Company were to furnish all the money required to sustain all losses, and be entitled to one half of the profits; and the other parties were to receive the other half of the profits for their services. This business was carried on in Mississippi, Tennessee, and Louisiana, and the account thereof kept on the books of Ames & Company, in St. Louis, in the name of Garrard, Sells & Company. At the close of the war, in connection with this cotton buying business, they opened a store at Vicksburg, Mississippi, which was conducted by one of their clerks named Satterlee. This business was carried on, first, in the name of Geo. A. Satterlee & Company, and afterward in the name of J. J. Garrard & Company, and with each concern an account was separately kept on the books of Ames & Company.

When Henry Ames died the account of Garrard, Sells & Company stood open on the books of the concern, showing, apparently, a large indebtedness from that concern to Henry Ames & Company, but representing in fact their own transactions in that firm name, and showing an immense loss. The account of Geo. A. Satterlee & Company had been transferred to the account of J. J. Garrard & Company, which also stood open on the books and was then the only active account representing actual assets in these Southern ventures. After the death of his brother, Edgar Ames conducted the business as before in the firm name on his own account. On the fourth of September, 1866, he qualified as executor of Henry Ames, and on the thirty-first of October, 1866, being the last day of the usual fiscal year of the partnership concern, he balanced the partnership books, made an inventory of the partnership assets on hand on the first of November, 1866, and filed the same in the probate court on the seventh of November, 1866. On this inventory the balances shown by the books to be due from Garrard, Sells & Company, and from J. J. Garrard & Company, appeared as part of the assets of the partnership in his hands on the first of November, 1866; but no account was taken of the real assets of the partnership in the south, which the account of J. J. Garrard & Company represented. The amount of these accounts, thus inventoried, was as follows: Garrard, Sells & Company, $573,819.51; J. J. Garrard & Company, $16.980.58. Edgar Ames, as surviving partner, continued in the administration of the partnership estate from the first of November, 1866, until the ninth of December, 1867, when he died intestate, without having made any settlement as such surviving partner with the partnership estate. On the eighteenth of December, 1867, letters of administration on the estate of Edgar Ames

were granted to his widow, Lucy V. S. Ames, who gave bond and also took charge of the assets of Henry Ames & Company for final administration; and she continued in the administration thereof, making annual settlements, until June 30, 1870, when she presented to the probate court her accounts for final settlement; when for the first time the actual assets of the Southern venture, as shown by what is known in the case as the "Webb Exhibits," filed therewith, were brought into the account. Among these assets were uncollected accounts due Satterlee & Company and J. J. Garrard & Company amounting to $69,365.39. These, with the other uncollected accounts of the estate, were afterward, on the twenty-ninth of August, 1869, sold at public sale in pursuance of an order of the probate court, and the administratrix became the purchaser thereof for the estate of her husband. On the filing of her report of this sale, John A. and William H. Scudder, as executors of the individual estate of Henry Ames, filed exceptions to so much thereof as related to the sale of these Southern uncollected accounts. The exceptions were sustained, and as to these accounts the sale was set aside. From this order of the probate court the administratrix appealed to the circuit court, and thence to the Supreme Court, where the decision of the probate court was affirmed at the March term, 1873, thereof (52 Mo. 290). Afterward, on the seventeenth of April, 1874, the administratrix filed an amended final settlement, in which the Southern assets, as shown by the "Webb Exhibits," were omitted, showing a balance in her favor of $53,666.18. To this settlement exceptions were filed by the executors of Henry Ames, and from the judgment of the probate court thereon an appeal was taken to the circuit court and thence to the Supreme Court, where, at the April term, 1884, of said court, the judgment of

the circuit court was reversed and the cause remanded to the circuit court for new trial, without direction (89 Mo. 496). Whereupon it was sent to a referee, C. S. Hayden, Esq., upon exceptions to whose report the case was retried in the circuit court, and the final account between the administratrix and the partnership estate stated—showing a balance due said estate of $59,971.75. From the final order and judgment thereon entered on the third of August, 1893, both parties appeal.

I. The matters complained of in this settlement on behalf of the administratrix are the following:

"*First.* That the court charged the administratrix with $39,508.22 on account of 'Southern assets as shown *per* Webb Exhibits,' and with other amounts on account of collections on said assets made since the date of said exhibits, and refused to allow as a credit or reduction from these amounts the sum of $39,523.61 which the evidence clearly disclosed Edgar Ames, prior to his death, had fully accounted for and paid to the partnership estate on account of these 'Southern assets.'

"*Second.* That the administratrix is charged with $833.33 on account of the 'Dennis Fitzpatrick matter' in excess of the amount she should be charged with on that account.

"*Third.* That the administratrix is charged with $1,321.38 on account of collections from F. R. Turley in excess of the amount with which she should be charged on that account.

"*Fourth.* That the administratrix is charged with certain sums to which the partnership estate is not entitled, to wit: $2,074.41 on account of 'Burney Indebtedness;' $1,100 on account of indebtedness of G. W. Nichol & Company; and $74.51 on account of indebtedness of J. & G. C. Porter.

"*Fifth*. That the administratrix is charged contrary to law and the evidence with the sum of $10,-147.73, and with interest thereon amounting to $16,-296.16 for 'amount withdrawn on October 31st, 1866, from partnership estate funds by Edgar Ames to equalize his account with that of Henry Ames.'

"*Sixth*. That the administratrix is charged contrary to law and the evidence with the sum of $12,508.48 as interest from August 14, 1866, to June 30, 1870, on $53,761.37, being the total amount of cash and merchandise at Vicksburg on said fourteenth day of August, 1866.

"*Seventh*. That the administratrix is charged contrary to law and the evidence, with sums paid by her for and on account of 'United States Income Tax,' said sums being $5,422.20 and $1,190.55.

"*Eighth*. That the court refused, contrary to law and the evidence, to allow the administratrix credit for $4,487.10 for expenses incurred by her in the several hearings of this cause before the referee under the two orders of reference made herein by said court.

"*Ninth*. That the court refused, contrary to law and the evidence, to allow the administratrix credit for the sum of $3,082.95, being five per cent commission on the sum of $61,659 credited to her as commissions; the court holding that the administratrix was not entitled to commission on commissions; whereas, under the law, commissions are allowed on the total amount of the personal estate without reference to the purposes for which it is distributed."

1. As the statement of the account by the circuit court is based upon the balance of $53,666.18, shown to be due the administratrix by her final settlement of March, 1874, in order to determine the merit of the first complaint it will be necessary to ascertain to what

extent the "Southern assets" entered into that balance.

In the first annual settlement of the administratrix, filed March 20, 1869—in which a balance due the partnership estate of $973,139.04 is shown—she charges herself with open accounts, as per inventory, in the sum of $999,110.49. Included in this amount is the Southern account aforesaid of Garrard, Sells & Company, amounting to the sum of $573,819.51. The balance from this settlement was carried forward and charged to her in her second annual settlement, filed April 1, 1870, by which a balance due the estate of $908,718.97 is shown. In this settlement the Southern accounts do not figure. This balance was carried forward and charged to her in her aforesaid final settlement of June 30, 1870. In this settlement she took credit for $573,819.51, the amount of the Southern account of Garrard, Sells & Company, charged to her as aforesaid, and charged herself with assets of Geo. A. Satterlee & Co., $59,843.35, and J. J. Garrard & Co., $38,590.16; making a total of $98,433.51, which sum purported to be the real assets represented by these accounts on the fifteenth of August, 1866, as shown by the "Webb Exhibits," of which amount the sum of $69,365.39 consisted of uncollected accounts, which were sold as aforesaid, leaving an actual cash balance of $29,068.12 charged against her on account thereof.

After the case arising on the appeal from this settlement was remanded (52 Mo. 290), the administratrix filed her amended settlement of April 17, 1874, now under consideration, in which, ignoring this last settlement, she charges herself with the balance of $908,-718.97 due on her second annual settlement, takes credit for $573,819.51—the amount of the Southern account of Garrard, Sells & Company, but took no account whatever of the real assets which the Southern

account of J. J. Garrard & Company represented. To which course she seems to have been induced by the conclusion (drawn from the opinion on that appeal) that the probate court had no jurisdiction over those assets or to settle her account therefor. Thus it becomes apparent that while the account of Garrard, Sells & Company first aforesaid, was accounted for, the administratrix failed to account for the account of J. J. Garrard & Company or any of the assets represented by that account, *eo nomine*, in any of her settlements; by which the balance in her favor of $53,666.18 was produced in the settlement of April 17, 1874, now in question. In this state of the case the circuit court, in revising her settlement and stating the account anew, as aforesaid, charged her with the said sum of $39,-508.22—the first charge complained of—being the amount found to have been actually realized from those assets, as shown by the "Webb Exhibits." It is not contended that the estate of Edgar Ames did not realize that amount from those assets; but the decision that the administratrix is accountable for the same, having been sustained by the Supreme Court (89 Mo. 512, 513.), she asks that, this amount having been determined, she be required to pay only so much of it as the partnership estate has not already received from Edgar Ames on account of those assets. The net amount realized from the Southern assets, as found by the court, consists of the following items, to wit:

| | |
|---|---:|
| As shown by the Webb Exhibits | $39,508.22 |
| Subsequently realized from Turley claim | 3,837.51 |
| Subsequently realized from Burney claim | 2,074.41 |
| Subsequently realized from Nichols & Co. | 1,100.00 |
| Subsequently realized from Brierly claim | 8,419.63 |
| Subsequently realized from Anderson claim | 5,755.43 |
| Subsequently realized from Porter claim | 74.31 |
| Total | $60,769.51 |

And the amount claimed to have been received by the partnership estate from Edgar Ames, on account thereof, being the said sum of $39,523.61; which amount counsel for the administratrix contend was in fact received by that estate in the following manner. The account of J. J. Garrard & Company, which was balanced on the thirty-first of October, 1866, showed a balance due from that concern of $16,980.58. This balance was carried into the inventory of Edgar Ames. The debit side of that account, consisting of cash and merchandise advanced, amounted to the sum of $111,-340.55, which was reduced to the amount of the balance by credits, October 31, 1866, of "bills receivable" amounting to the sum of $94,359.97. Included in the debit sum were advances made to said concern prior to August 14, 1866, amounting to said sum of $39,523.61. The bills receivable, which constituted the credit side of the account, consisted simply of drafts and acceptances of J. J. Garrard & Company, drawn by Edgar Ames—a part of which he had discounted and the proceeds thereof, to the amount of $59,650.58, carried into the cash account of the concern on the thirty-first of October, 1869, which went into the cash balance of $27,704.05, of that day; which balance was carried into the inventory, as was also the remaining bills receivable, amounting to the sum of $34.709.39. Thus it will be seen that on the books of Ames & Company, and on the inventory of Edgar S. Ames, the whole of the account of J. J. Garrard & Company, as it appeared upon the books of Ames & Company before it was balanced, amounting to the sum of $111,340.45, was accounted for as follows:

By cash from discount of bills receivable (inventoried
    in cash balance of $27,704.05) .....   ........ $59,650.58
Remainder of bills receivable (inventoried)........... 34,709.39
J. J. Garrard & Co., account, balance (inventoried).. 16,980.58

       Total........................... .........$111,340.55

Having thus been accounted for in the inventory, was that amount accounted for, in fact, to the estate? This is the important question, which can be determined only by the settlements thereafter made.

After the death of Edgar Ames and on the twenty-third of March, 1868, the administratrix filed a settlement of Edgar Ames' account to the date of his death, in which settlement she was charged with the inventory, and consequently with the foregoing items—and thus accounted for them in that settlement, in which a balance due the partnership estate of $1,750,638.95 was shown. If that balance had been carried into the first annual settlement of the administratrix of March 20, 1869, and had been accounted for by the disbursements of that and the subsequent settlements which produced the balance in her favor of $53,666.18 on her final settlement, of the seventeenth of April, 1874, it would be apparent on the face of the settlements that the whole of the debit side of the account of J. J. Garrard & Company, including the charges as well before as after the fifteenth of August, 1866, amounting to the sum of $111,340.55, had been accounted for; but this was not done. Instead, she, in that settlement, charged herself only with the assets that actually came into her hands as administratrix *de bonis non;* and unless the items representing that sum can be discovered among the assets thus charged, the same has not been accounted for. Now, while the cash and bills receivable thus charged do not appear *eo nomine* in the assets with which she charged herself in her first settlement, it does appear that in the item of "open accounts" with which she did charge herself in that settlement, amounting to the sum of $999,110.49, was included the account of Edgar Ames, amounting to the sum of $366,393.30; into which by that time the cash and bills receivable must necessarily have passed. So that

if the books were correctly kept and that account was correctly stated, there can be no question that therein the sum of $94,359.97, the amount of the bills receivable with which the account of J. J. Garrard & Company was credited on the thirty-first of October, 1866, was accounted for.

After the most searching scrutiny, to which these books and this account have been subjected, continuing for a period of a quarter of a century, no error affecting this matter has been found or pointed out; and it is perfectly safe to assume that the amount aforesaid had been paid by Edgar Ames and accounted for to the partnership estate, in the account aforesaid, on account of the assets represented by the Garrard account at the time the administratrix came to make her first settlement. But there is no ground for assuming that the balance due on that account, amounting to the sum of $16,980.58, was accounted for in the account. There is no reason why it should have gone into it; and no evidence tending to prove that it did; and as the administratrix failed to charge herself with that balance in that, or any of her subsequent settlements—when she was called on to account for the actual assets which that account represented at the death of Henry Ames, she would not be entitled to a credit for the amount of that balance, having obtained credit therefor already by omitting to charge herself with that balance. So that what we have to do with now are the debits and credits of that account only. It appears by the debit side of that account, amounting to the sum of $111,340.55, showing the amount of goods and cash sent to Vicksburg by the partnership concern and charged to J. J. Garrard & Company from the beginning to the thirty-first of October, 1866, that on and before the fourteenth of August, 1866, the date to which the inventory of the "Webb Exhibits" was

made up, the amount sent was $49,523.61; for which amount the administratrix claimed credit before the referee, and also in the circuit court; but, it further appearing that the last of the items, constituting the charges aggregating that amount, was $10,000 cash charged in St. Louis on the fourteenth of August, the counsel for the administratrix, conceding that that item could not have reached Vicksburg and been included in the "Webb Exhibits," reduced their claim in their brief in this court to the sum of $39,523.61; and their attention having in the course of the oral argument been called to the fact that the next preceding item was a charge on the eleventh of August, 1866, "to merchandise, $3,782.13," and that it appeared from the evidence that the merchandise was shipped to Vicksburg by steamboat, they at once conceded that this item could not have reached its destination in time to have been included in the Webb Exhibits; and that the claim should be reduced by that amount; so that the credit really claimed is now $35,741.48, being the amount of items charged in the Garrard account which actually went into the "Webb Exhibit" inventory of the fourteenth of August, 1866, and which it is claimed were accounted for to the partnership estate in the settlement of that account by Edgar Ames, as aforesaid. This contention would have to be sustained if that account had in fact been thus settled in full; but as we have seen, this was not done. It was only accounted for partially; that is to say, to the extent of the bills receivable credited on the thirty-first of October, 1866, to the amount of $94,359.97, which was all the partnership estate had received for its cash and merchandise sent to Vicksburg, both before and after the fourteenth of August, 1866, up to the time when it was proposed to charge the administratrix with these assets in lieu of the account. In order, then, to ascertain

how much of this amount should be credited against the charge for the actual assets as found by the court to have been on hand on the fourteenth of August, 1866, as per the Webb Exhibits, an amount must be deducted therefrom sufficient to discharge the aggregate amount of the items of the account succeeding that date, representing the money and merchandise of the partnership estate which did not go into the Webb Exhibits, or any other inventory thereof, and, consequently, were never accounted for in any of the settlements. The aggregate amount of those items is $75,599.07, which being deducted from said sum of $94,359.07, leaves a balance of $18,760; with which amount the administratrix should have been credited against the charge of $39,508. 22, instead of with the amount $35,741.48, as claimed by counsel for the administratrix, leaving as the actual amount with which the administratrix ought to have been charged on account of assets shown by the Webb Exhibits the sum of *$20,748.22.* Or, to state the matter in another form, the administratrix should have been charged with the assets of the partnership on hand at Vicksburg, as shown by the Webb Exhibits on the fourteenth of August, 1866, in the sum of $39,508.22; and the assets sent to Vicksburg between that date and the thirty-first of October, 1866, not inventoried, in the sum of $75,599.07, making a total of $115,107.29. From which amount should have been deducted the sum accounted for by Edgar Ames in bills receivable of the latter date, i. e., the sum of $94,359.07, leaving a balance of $20,748.22, as the sum with which she should have been charged on this account, instead of $39,508.22; consequently, she is entitled to a deduction from that charge of $18,760, which is allowed.

2. The court in its settlement charged the administratrix with $3,323.33, being the amount collected on

the Dennis Fitzpatrick matter, less $10 paid therefor by her at the sale which was set aside. Against which amount she claims she ought to have been allowed a credit of $833.33, the amount paid R. A. Watt for collecting the same. The facts in regard to this matter are about as follows: Dennis Fitzpatrick had a contract with the St. Louis County Court to build an insane asylum; Henry Ames & Company and the said Watt and others were sureties on his bond for the performance of his contract and on account thereof Henry Ames & Company were compelled to pay the sum of $5,029.13—the account of which was inventoried by Edgar Ames as assets of the concern. This building, however, seems to have been completed by the sureties about May 1, 1869, and on the twelfth of July, 1869, a petition in behalf of the bondsmen, signed by "Lucy V. Semple Ames, Administratrix of Henry Ames & Company" and S. Simmons was presented, asking for relief on said contract; upon consideration of which, the court, after first granting the prayer of the petition and ordering the payment of the sum of $18,622.14 to the sureties, afterward, on the twenty-second of July, 1869, reconsidered the matter and referred the same to the county auditor. On the thirteenth of September, 1869, the auditor filed his report and the same was continued for further consideration. Afterward on the twenty-sixth of October, 1869, an amended petition, signed by "S. Simmons, for himself and other co-sureties," was presented to the court; the prayer of which was refused on the twenty-eighth of the same month. And thus the matter rested until August 9, 1870, when the county court made the following order:

"*In the matter of petition for securities of D. Fitzpatrick.*

"The court this day reconsiders its action had

herein on yesterday in disallowing the claim of Samuel Simmons and others, securities for Dennis Fitzpatrick, contractor for the brick work of the County Insane Asylum, by the following vote: Justices Allen, Long, Brannan and Conrades voting yea, and Justices Farrar, Dailey and Cronenbold voting nay. And thereupon, upon motion of Justice Conrades, the court orders that the sum of ten thousand dollars be, and the same is hereby allowed said securities in full for their claim against the county on account of loss sustained by them in completing the work contracted for by said Dennis Fitzpatrick. Justices Allen, Long, Brannan and Conrades voting yea, and Justices Farrar, Dailey and Cronenbold voting nay on said allowance."

In the meantime this claim had been returned by the administratrix with her settlement of June 30, 1870, as an uncollected open account, credited as such, ordered to be sold by the probate court and purchased at the sale for the sum of $10 by the administratrix, which sale was afterward set aside. "Some time after the sale was made Watt came to Mr. Crosby, the agent of the administratrix, and said that he was hoping to get a claim through the county court in the Dennis Fitzpatrick matter and wanted to know if he should go on and collect it; that he would expect 25% of whatever amount was collected as compensation for his services; which amount was agreed to be paid him, and some time afterward there was $3,333.33 collected. . . . . . . ." and paid by Watt to Mrs. Ames. Whereupon Crosby paid him twenty-five per cent of that amount for his services, which is the amount of the credit now claimed.

This is the substance of the account which Crosby gave of the transaction, on whose evidence reliance is placed for the credit. We find nothing in it to warrant

VOL. 142 mo—14

the court in making the allowance. It is not disputed that this payment to Watt was made in pursuance of the order of the county court of August 9, 1870, entered twenty days before the sale of the assets by the administratrix, on August 27, 1870. So that, as far as the evidence shows, when the agreement between Crosby and Watt was made, the amount which Watt collected was already ordered to be paid, and all the administratrix had to do was to draw it. There was no necessity for getting a claim for it through the county court; it was already through, and there is no evidence that Watt performed any service whatever in getting the claim allowed, although, as one of the sureties, he was, of course, interested in that accomplishment. All the services he did, or could have done under the agreement, was to receive the money and pay it over to the administratrix. To collect it was the duty of the administratrix, compensation for which is fixed by law, and for which she can claim no credit beyond such compensation.

3. The court in its settlement charged the administratrix with the following amounts on account of the Southern assets: To amount collected from F. R. Turley, $3,837.51; to amount collected on Burney indebtedness, $2,074.41; to amount collected on indebtedness of G. W. Nichol & Co., $1,100; to amount collected on indebtedness of J. & G. C. Pòrter, $74.31; which are the charges objected to in the third and fourth items of the administratrix's complaint. These charges made by the referee and approved by the circuit court arose upon exceptions of the executors charging the appropriation by the administratrix, through the Webb Exhibits, of amounts collected from the Southern debtors of Satterlee & Company and Garrard & Company to the estate of Edgar Ames, that should have been applied to the partnership estate,

and can be best considered and ruled upon in connection with those exceptions. The material facts bearing upon those exceptions are fairly stated in the report of the referee and are made sufficiently apparent by the following extracts therefrom:

"At the death of Henry Ames on the 14th of August, 1866, Edgar Ames did not have the goods or assets of the Southern firms appraised, nor did he account for their value; nor was any change made or balance drawn on the books of the Southern firms in consequence of Henry Ames's death; but business and books in the South were treated as if no death had occurred. Until the exhibits known in this case as the 'Webb Exhibits' were made out and filed in the probate court, upon the presentation there of the first final settlement of this administratrix at the June term, 1870, there was no ascertainment and separation by Edgar Ames, or his representative, or the representative of the partnership estate of Henry Ames & Co., of the property of that firm in the South, as it had existed at the time of Henry Ames's death. Before the filing of this administratrix's first final settlement of the partnership estate, Webb, the former bookkeeper of Satterlee & Co. and Garrard & Co., took the books of those firms, being the books in which the accounts with the Southern customers had been kept, and, under the supervision of J. J. Garrard, the principal man of those firms, made from those books statements of the accounts in them, and of the property of Henry Ames & Co. in the South, as of August 14, 1866, the date of the death of Henry Ames, with a view of showing what the indebtedness of the Southern customers to Henry Ames & Co. was, and what were the assets and liabilities, nominally, of Satterlee & Co. and Garrard & Co., but really of Henry Ames & Co. at the date of Henry Ames's death. These statements exhibit, not all the

detailed accounts as those appear or would have appeared in the books, but rather the summing up of the accounts of the debtors, the amount of the accounts, the amount collected, the date of collections, the liabilities of Satterlee & Co. and Garrard & Co., and the valuation of the stock. These Webb Exhibits were filed with the first final settlement at the June, 1870, term of the probate court. Before there was any hearing, and in the fall of 1870, the exceptors, under notice to the administratrix, took the deposition of Webb and examined him at length as to these exhibits and the state of these debtors' accounts. Under the present exception the exceptors go behind these exhibits, deny that the amounts as shown by them are correct, and contend that various sums of money were paid by these debtors, which sums should have been applied to extinguish the older indebtedness to Henry Ames & Co., but which payments these exhibits, as made up, mostly, if not wholly, ignore. The books of Satterlee & Co. and Garrard & Co. are now lost; Webb is dead; Shaw, the predecessor of Webb, is dead; and the Webb Exhibits and the testimony of Webb and Garrard remain the principal, and, with the testimony of Crosby, the only, sources to which recourse can be had as evidence as to what those books contained.

"Attached to this exception is a list of names to which are affixed amounts, these names being those of certain of the Southern customers; and these amounts, the exceptors contend, are the sums which in the cases of those customers, have been collected and misappropriated by Edgar Ames or this administratrix . . . . . . . It can not be told what the arrangements were, what debts were to be paid out of this or that crop in most of these cases. The evidence is different in different cases; but though the administratrix failed in some cases to prove her contention, in those very cases there

may have been binding arrangements, and advances may have been made and cotton, the proceeds of which were realized, may have been shipped and sold on that basis. It can not, in favor of the exceptors, be assumed that such was not the case, especially when the evidence shows that sometimes such was the case . . . . . . . That such agreements were in some cases made and executed, the proof shows.    Sometimes money was advanced, sometimes labor. was paid for, sometimes agricultural implements were furnished, and the repayment was, by the arrangement, to be from the proceeds of a particular crop.    Garrard, who was the chief man of those Southern firms, testifies that the books of Satterlee & Co. and Garrard & Co. would show to what extent agricultural implements, etc., were advanced. . . . . . . . But there is an objection to the theory of the exceptors which lies behind this. The intent of the Brothers Ames, as early as June, 1866, some months before the death of Henry Ames, seems to have been to turn their Southern business into a new channel, and for this purpose to establish the house of Garrard & Craig in New Orleans, and in doing so to wind up the business of J. J. Garrard & Co.; the member or principal member of which firm was to be transferred to New. Orleans.    But there was business that could not suddenly be brought to a close. The part of the Southern States where their business had been carried on was, as the effects of the civil war and bad crops, in a very impoverished condition.    Large amounts were due those firms from planters who depended solely upon their crops for payment, and no doubt it was in some, perhaps in many cases, necessary for Edgar Ames to make advances from his funds, after the death of his brother, to afford a chance of recovering any indebtedness, old or new.    It should also be kept in mind that Henry Ames, in entering into this Southern bus-

iness with his brother, must have had in view its nature, the manner in which it was carried on, and those peculiar features in it which did not exist in an ordinary business in ordinary times.

"Under these circumstances, and bearing in mind that Henry Ames died in the midst of what is called the cotton season, it can hardly be contended that Edgar Ames, upon the death of his brother, had no right, no matter what were the arrangements between the Southern firms and the planters to make the contested appropriations.  It does not appear that these appropriations were made in consequence of any instructions from Edgar Ames.  Garrard says he received no instructions from Edgar Ames as to how any moneys paid by the Southern debtors after August 14, 1866, should be appropriated; and when asked, where customers were indebted before August 14, 1866, and collections were realized from them and applied to accounts contracted after that date instead of to prior indebtedness, when and by whom were such credits so applied, Garrard says that Webb kept the books and entered all the credits and debits upon the accounts on the books, as the books will show.  It would appear from what Garrard elsewhere says, that where arrangements were made for advances on particular crops, the books of the firm showed these arrangements; and from what Webb and Crosby testify we must infer that in making out the balances of the Webb exhibits Webb was guided by these special agreements as shown by the books of the two firms . . . . . . . The reasonable conclusion drawn from the whole evidence seems to be that there was no invariable practice; that sometimes payments were appropriated, so far as they went, to wipe out the oldest indebtedness; that at other times where an agreement or understanding existed between the parties as to a particular crop and advances on the

faith of it were made, the old balance was disregarded and the credits first applied to what was regarded as the debt of that crop. It would seem, too, that the books of Satterlee & Co. and Garrard & Co. in some, if not in all cases, showed those crop arrangements.

"If such were not the case, it is difficult to understand how, with the full ledger accounts of all these parties before the exceptors, they for so many years neglected to attack the Webb exhibits and raise before the probate court this important question as to the appropriation of payments involving so many accounts and so much money. In the absence of special arrangements the rule of law was clear, and it was patent that Edgar Ames, or the Southern firm for him, would have had no right to prefer himself to his beneficiary's estate, or, in other words, the partnership estate. The ledger accounts, with their numerous and often large credits, though they do not disclose the evidential facts, do point directly and indeed suspiciously in many cases to a disposition of moneys received that the law forbids to a person in the situation of Edgar Ames. As no attack was made under these circumstances upon the Webb exhibits, and no question raised in the probate court as to the misappropriation of any of those payments, the conclusion is almost inevitable that the balances, as shown by the Webb exhibits, were accurate and were, in spite of suspicions raised by the ledger credits, sustained by facts appearing from the journals, the cash books, or other books of the Southern firm. This conclusion is confirmed by the direct testimony of Webb, who made the exhibits from the books, and by that of Crosby, who, before the Webb exhibits were filed in the probate court, went to Vicksburg and there carefully compared the books and the exhibits. It was after those exhibits had been on file some months in the probate court that

the exceptors gave notice to the administratrix and took the deposition of Webb and others at Vicksburg, where the books of Satterlee & Co. and Garrard & Co. were produced. Each side was represented by counsel and each, it appears, had a bookkeeper present on its part. The hearing was protracted and there was full opportunity and every motive to sift the books, the Southern accounts and the Webb exhibits. . . . . . .

"In the first list of names and amounts embodied by the exceptors in the present exception, the amounts set against the names indicate the several sums which the exceptors contend were collected and misapplied, as above stated. The referee finds that the exceptors have failed to show that said or any sum were collected and misapplied as alleged, and finds that it is not shown and does not appear that said or any moneys were collected or received in connection with these accounts, or any of them, by Edgar Ames, or his administratrix, which should have been appropriated to the partnership estate of Henry Ames & Co. and which have been retained by Edgar Ames, or for his estate, except as hereinafter stated."

The referee then proceeds to an examination of the Turley, Burney, Nichols and Porter accounts, excepted from the foregoing ruling, and after a careful analysis of all the evidence bearing upon them finding no equitable basis upon which the payments made to the administratrix on these accounts could be pro-rated, and no sufficient evidence that they were paid on account of advances made after the fourteenth of August, 1866, held that they should be applied on the indebtedness prior to that date, and accordingly so charged the administratrix, upon the well recognized principle that the trust and not the individual interest is to be preferred in case of conflict between them.

After a like careful examination of all the evidence

in regard to the Mississippi accounts, we reach the same conclusion as did the referee in regard to those accounts and conclude that the circuit court committed no error in sustaining the ruling of the referee as to the application of payments on all those accounts; and in charging the administratrix with the payments aforesaid on the accounts of Turley, Burney, Nichols and Porter.

4.   At the death of Henry Ames there was on the books of Henry Ames & Company an individual account of each of the brothers. At various dates between that time and the thirty-first of October, 1866, when the books were balanced, Edgar Ames withdrew from the partnership funds the sum of $10,147.73, to equalize those accounts; with which amount and interest the court charges the administratrix in its settlement, which is the subject of the fifth item of her complaint.

When the case was here before this matter was considered and passed upon (89 Mo. 508).   That part of the opinion in which it was disposed of is as follows:

"It had been the custom of the brothers, Henry and Edgar, composing the firm of Henry Ames & Company, to keep everything in common, and whether one brother drew from the firm for his private expenses more than the other, made no difference in the adjustment, as all these sums were charged to 'expense' and settled in that way at the end of the year.   This custom had acquired the binding force of a contract, supported, too, by a valuable consideration, to wit, that whereas one brother might draw out, in any one year, more than the other, the latter might do the like the next year; and this in all probability was the current of such events and led to the adoption of the custom in question.   The act, then, of Edgar Ames in drawing out from the assets of the firm, after his brother's

death, $10,356.06, to make the amount drawn out by him equal to that drawn out by his brother, was wholly unwarranted. And as no evidence was adduced as to the terms of the partnership contract between the brothers, it may not unreasonably be inferred from the long continued dealings between partners what those terms were; and even if there was a written contract of partnership, this would not prevent such a custom from being engrafted thereon by the force of long usage.

"The maxim in this case applies; *Consuetudo societatis, est societatis lex.* The amount just mentioned constitutes a proper debit against the estate of Edgar Ames, and as the administratrix failed to charge him therewith, she ought to be charged with it on her final settlement of the partnership."

Some additional evidence was taken on the rehearing in regard to this matter, and the same was considered anew by the referee and the circuit court. In the light of which the former reversed and the latter affirmed the position taken by this court. We have carefully examined this evidence, and while we find it simply cumulative in character, it tends rather to confirm than to impair our confidence in the correctness of our former conclusion. In brief it appears therefrom that prior to 1862 no accounts were ever kept with either of the brothers, but what was drawn by them from the concern for their personal use was charged direct to the expense account of the firm. That in 1862 an individual account with Edgar Ames was opened, but at the end of the year the amount thereof was charged to the expense account, and this continued until the death of Henry, while Henry's withdrawals continued to be charged to the expense account as before, until October, 1865, when an account was also opened with him. Before the end of that fiscal year Henry died; and thus it happened that these two ac-

counts stood open on the books of the concern at that date. We find nothing in the evidence to create a doubt that, had Henry lived until the end of the fiscal year when the books were balanced, that those accounts would have been carried into the expense account as had, in effect, always theretofore been done. These accounts seem to have been opened by each of the brothers against himself for the purpose of information to each in regard to the extent of his personal expenses, rather than for the purpose of an accounting between themselves; and we find no warrant in the evidence for departing from their long continued custom—a custom that had no regard for any excess that one brother might need and withdraw for his personal expenses over the other. We adhere to our former ruling on this subject and find no error in this charge.

5. When this case was here before it was held that Mrs. Ames, as administratrix of the partnership estate, was chargeable with the moneys received by her as the proceeds of the partnership business conducted in Mississippi (89 Mo. 513); and in pursuance of that decision she was charged by the circuit court with the sum of $39,508.22 on account of "Southern Assets as shown by the Webb Exhibits," being the net amount in her hands on that account on the thirtieth of June, 1870, and in addition, the court, sustaining the referee, in its settlement, charges her with $12,508.48 interest from August 14, 1866, to June 30, 1870, on $53,761.37, the gross value of the goods and money on hand at Vicksburg on the fourteenth of August, 1866, from which and subsequent collections the amount aforesaid was realized. This charge is the subject of the administratrix's sixth complaint, and seems to have been made, not because Edgar Ames or his administratrix did or could have realized for the estate that or any other amount of interest on those assets, but on the theory that

Edgar Ames, by failing on the death of his brother to inventory those assets and thereafter keep a separate account of them, wrongfully converted the same to his own use and ought to be charged with interest thereon for this omission of duty, as if he had in fact so converted them; although, in point of fact, it does not appear that any loss has accrued to the estate by this omission of duty, or benefit to the surviving partner by reason of any use made by him or his administratrix of the assets; and it does appear that the proceeds of those assets were applied by them to the payment of the debts of the concern as fast as in the ordinary course of business they could be realized upon between the dates aforesaid, and the balance then accounted for; the sum of $18,760 having been accounted for, as we have seen in the first paragraph of this opinion, on the thirty-first of October, 1866, on account of those assets; and an amount equal to three fifths of all the available assets in hand on the fourteenth of August, 1866, including the money and goods aforesaid and all collections thereafter made, having been in fact paid out to discharge liabilities of the concern due at that date within three or four months thereafter. Under such circumstances there is no equity in charging the surviving partner with interest on assets used, evidently not for his own benefit, but for the benefit of the partnership estate. Besides, it must be remembered that these were foreign assets, beyond the jurisdiction of the courts of this State, being administered upon in the first place by the surviving partner under his common law right to convert the same into money in the usual course of business and apply the same to the payment of the partnership debts. The appointment of Mrs. Ames as administratrix *de bonis non* of the partnership estate upon the death of the surviving partner, conferred no jurisdiction upon her over these

assets, and imposed no duty on her in respect to them. Woerner, Law Adm., chap. 17; *Easton v. Courtwright*, 84 Mo. 27. It was only when she became the recipient of the proceeds of those assets in her official capacity in this State that she became chargeable with the duty of accounting therefor to the partnership estate in the courts of this State (89 Mo. 513) and accountable only for what she did in fact receive.

Upon no principle of law or equity can she be made accountable for this item of interest, which she did not receive and could not have received. The court committed error, we think, in making this charge, and it should not be allowed to stand.

6. The administratrix in her settlement took credit for two amounts, $5,422.20 and $1,190.55, paid by her on account of income tax to the United States government, which the court below disallowed and charged to her in accordance with the decision of this court when the case was here before (89 Mo. 512), after hearing some additional evidence on the matter, the substance of which was that the payments were made on the advice of counsel and the return of income made only after repeated solicitations therefor by the United States officials. The evidence does not materially change the complexion of this issue; and as it was directly passed upon in the former decision, it must be held to have been thereby finally adjudicated, which disposes of the seventh item of the administratrix's complaint.

7. The administratrix claimed to be allowed the sum of $15,228.70 for expenses and attorney's fees incurred in this cause since the former appeal to the Supreme Court; from which amount the court below in its settlement deducted the sum of $4,487.10 and allowed her on that account the sum of $10,741.60. This deduction is the subject of her eighth complaint.

As the referee and the circuit court, before whom these expenses were incurred and services rendered, were in a much better position than we are to determine their amount and value and make an equitable apportionment of them; and as we discover nothing unfair or inequitable in this allowance, we are not disposed to disturb it.

8.   It appears, from a detailed statement made by counsel for the administratrix from her settlements, that the total value of the personal property administered upon, including certain items charged to the administratrix as assets by the court on the final settlement under consideration, amounted to the sum of $1,367,-397.80; upon which, apparently, the administratrix is entitled to a commission of five per cent, amounting to the sum of $68,369.89.   The total amount allowed her on this account was $65,335.33, leaving a balance of $3,034.56, for which she claims an additional credit. This statement seems to be correct, except that included in the aggregate value of the personal estate are four items which, if the present adjustment of the account be correct, should be deducted therefrom, viz.:

| | | |
|---|---|---|
| (1) | Credit allowed in paragraph 1 of opinion... .... ... | $18,760 00 |
| (2) | Charge for interest disallowed in paragraph 5 of opinion. ........................ . ............ | 12,508 48 |
| (3) | Commission taken by Edgar Ames, disallowed......... | 14,432 75 |
| (4) | Commission on rents, disallowed.................... | 2,973 23 |
| | Total .... ..................... ............. | $48,674 46 |
| | Deducting this amount from........................$1,367,397 80 | |

There would be left the sum of...................... . ..$1,318,723 34

as the real value of the personal estate administered upon; upon which the administratrix would be entitled to five per cent commission, amounting to the sum of $65,936.16; and, having been allowed only $65,335.33, she is entitled to an additional credit on this account in the sum of. $600.83, which disposes of

the ninth and last item of the administratrix's complaint.

II.   We will now proceed to the consideration of the objections to the settlement of the circuit court, made by the executors of Henry Ames, deceased, as near as may be in the order in which they are urged in the brief of counsel.

*A.*   It is first questioned whether the administratrix has made sufficient showing to entitle her to credit for the account of Garrard, Sells & Company.

In the inventory of Edgar Ames, filed November 7, 1866, among the accounts due Henry Ames & Company was charged the account of Garrard, Sells & Company, amounting to the sum of $573,819.51—balance due on the thirty-first of October, 1866.   After that balance was struck the account was credited November 1 by Garrard & Craig, $50,000, reducing the balance on that account to $523,819.51; and at the same time the $50,000 credit was charged to the account of Garrard & Craig.   So that, after the death of Edgar Ames, when the administratrix came to file her inventory of the estate remaining unadministered upon, she inventoried the accounts as changed by these entries. Among the accounts charged in inventory filed by Edgar Ames and remaining uncollected as follows: "Garrard, Sells & Co. (amount remaining after the transfer by Edgar Ames of $50,000 to account of Garrard & Craig), $523,819.51."   And among new accounts due since the filing of said inventory by Edgar Ames and remaining unpaid: "Garrard & Craig (amount transferred from old account of Garrard, Sells & Co.), $50,000.00."   And charged herself in her first annual settlement in the amount of open accounts due the partnership estate with the aggregate amount thereof, $573,819.51; and, having carried this debit

through her settlements, on her final settlement she asked credit therefor in manner as follows:

"By Garrard, Sells & Co.—This amount representing moneys expended by Henry Ames & Co. in cotton speculations with J. J. Garrard, Miles Sells and Alpheus Lewis, and being no asset in fact—all the assets of 'Garrard, Sells & Co.,' or Geo. A. Satterlee' of 'J. J. Garrard & Co.,' belonging to Henry Ames & Co., and the amount of these assets having been charged above in this settlement.    $523,819.51

"Garrard & Craig.—This amount represents the capital which Henry Ames & Co. agreed to put into the firm of Garrard & Craig, of New Orleans, as partners *in commendam*, but in fact they never did so, and this amount was transferred to Garrard & Craig by Edgar Ames on the books of Henry Ames & Co. out of the supposed assets of Garrard, Sells & Co., but in fact these assets never came to Garrard & Craig."    $ 50,000.00

Which credit the court allowed in its settlement. It appears from the evidence that in June, 1866, about the time Henry Ames & Company changed the name of the concern at Vicksburg from Satterlee & Company to J. J. Garrard & Company they determined to open a cotton factorage business and commission house in the city of New Orleans under the name of Garrard & Craig with a special capital of $50,000. Instead of furnishing the money they drew a draft on J. J. Garrard & Company for the sum of $50,000, which

Garrard & Company accepted. This draft was used before a notary in New Orleans as evidence that the special capital had been furnished so as to comply with some supposed or actual requirements of the law of Louisiana concerning the formation of such co-partnerships, and having served its purpose, no further use was made of the draft. It seems to have occurred to Edgar Ames after the books of the concern were balanced on the thirty-first of October, that some record of this transaction ought to appear on the books of the concern, so he thereupon caused a memorandum thereof to be entered upon the journal and the charges aforesaid to be made on the ledger. The evidence is conclusive that not a dollar of the draft was ever paid to Garrard & Craig or that they were indebted to Ames & Company to the amount of a cent on account thereof. It was a mere paper transaction and the charges and credits aforesaid a mere matter of book keeping, representing nothing in the way of indebtedness by Garrard & Craig any more than did the other accounts of Garrard, Sells & Company, Satterlee & Company and J. J. Garrard & Company, all of which represented nothing more than the actual assets of the partnership in the South; for all of which the administratrix has been required to account in this settlement, and having accounted therefor is unquestionably entitled to a credit for any of these accounts with which she has charged herself in her settlement. The court, therefore, committed no error in crediting her with said sum of $573,819.51 as aforesaid.

*B.* The allowance of twenty per cent deduction from the amount of assets shown by the "Webb Exhibits" for depreciation in the stock of goods at Vicksburg, made by the trial court in this settlement, was in accordance with the ruling of this court when the case was here before (89 Mo. 508); and while the question

VOL. 142 mo—15

is reargued by counsel for the executors, no new evidence was introduced on that subject and the question must be held to have been adjudicated by the former decision.

*C.* It appears from the record that from the time that the "Webb Exhibits" were filed in the probate court on the thirtieth of June, 1870, until April 27, 1887 (after the case had for the second time been appealed to this court and remanded), these "exhibits" were accepted by all parties and acted upon by all the courts through which the final settlement with which they were returned, had passed as a correct inventory of the assets of the concern of Satterlee & Company, and J. J. Garrard & Company belonging to the estate of Henry Ames & Company for which the administratrix was accountable. At the date last aforesaid the executors for the first time filed exceptions to the settlement, calling in question the correctness of those exhibits; for which other exceptions, still more comprehensive and of like character, were finally permitted to be substituted on the sixteenth of June, 1890. These exceptions in effect required a re-statement of a long list of the accounts of the concerns to the date of the filing of the exhibits and a re-application of payments thereon before and after that date, on the theory that all the assets of these concerns had, in fact, on the fourteenth of August, 1866, been converted by Edgar Ames to his own use. These exceptions, under directions of the circuit court, were finally heard by the referee, Mr. Hayden, in the light of all the evidence that could at that late date be obtained in regard to these accounts. He took up each one of them and with infinite patience carefully examined it in connection with the objections to the amounts accounted for thereon in the light of all the evidence bearing upon it that was offered or could be obtained; and in an

exhaustive report, containing in each case an analysis
of the testimony and the result of his investigations,
charged the administratrix with such amounts as he
found from the evidence she ought to be charged with
on account thereof, and overruled the exceptions to
the remainder.   His action in this behalf was approved
by the circuit court except in one instance (the H.
W. Anderson account), in which the amount charged
by the referee to the administratrix was reduced from
the sum of $7,537.59 to the sum of $5,755.43.    After a
careful consideration of all the evidence on this branch
of the case, scattered through the immense record
before us, and of the argument of counsel in support of
their views in respect thereof, we feel as well satisfied
with the conclusion reached by the referee, modified in
the instance aforesaid by the circuit court, as to the
other accounts in the list specified, as we do with his
conclusion as to the accounts of Turley, Burney,
Nichols and Porter, disposed of. in paragraph 3 of this
opinion, and shall not disturb the ruling of the circuit
court thereupon.

   *D.*   After the death of Henry Ames, on the four-
teenth of August, 1866, Edgar Ames continued the
business of the firm, as before stated, until the
thirty-first of October, 1866, when, in accordance with
their custom, the business of the year was closed and
the account thereof stated and inventoried.   After this
he continued in the business on his own account in the
name of the firm "At The Old Stand," which was the
property of the brothers, until his death on the ninth
day of December, 1867; engaged there also at the same
-time in settling up the partnership business of the
former firm and administering upon the estate of his
brother, of which he had been appointed executor.
While accounting to the partnership estate for the rent
of the premises and for the use of the property and

money which belonged to the brothers, or the partnership estate after the thirty-first of October, he did not inventory or account for the "good will." A charge for the "good will" against the administratrix, based upon an alleged sale thereof by her, was disallowed by this court on the former appeal (89 Mo. 506), the court saying, however, that: "If the exception made had instead been one as to whether Edgar Ames should have charged himself with the good will of the firm as an asset thereof, a different question might have been presented." After the case was remanded, among the new and additional exceptions filed to the settlement, as hereinbefore stated, was the following: "7th. That the said administratrix failed to inventory and account for a claim existing in favor of said partnership estate and against the estate of Edgar Ames, deceased, for the value of the good will of the firm of Henry Ames & Company which was appropriated by said Edgar Ames to his own use and not accounted for, amounting in value to about $20,000."

The referee refused to charge the administratrix with anything on account of the matter of this exception on the evidence introduced, of which, in his report, he gives the following summary: "On this point there is no substantial difference of opinion between the witnesses called for the exceptors and those called for the administratrix. Mr. William H. Scudder, one of the exceptors, was of opinion that the good will of the firm at the death of Henry Ames was worth $20,000. In answer to the question, 'Suppose you would not have gotten the exclusive right to the use of the old firm name, but that Edgar Ames would have been carrying on business in the same name?' Mr. Scudder replied that the good will would not have been worth anything. Mr. Bartle was of opinion that the good will of the firm of Henry Ames & Co. in the fall of 1866 was worth

$50,000, but that if the surviving partner should have continued the business, and used the former firm name and brands, the good will would not have been worth much, though it would have been worth something. If the buyer was not known in business by any other name than his own, he would be very glad to give a very handsome sum for the name of Henry Ames & Co., if he only could put the head brand on his packages and ship them south, as long as this would last. Mr. McEnnis was of opinion that the good will of a house or partnership, doing business in the pork packing and provision line, was rather doubtful and difficult to estimate. The business varied a great deal, the articles were perishable, and much depended on the personal character of the partners in keeping up the standard and excellence of the meats. 'The value to a great extent of any packers' brands rests on himself, the manner in which he does his business; the brand is of little value. 'It loses its value the very moment the men who cure the meat drop out. We see that in the number of brands which have failed in this country. It is almost impossible to fix the value; it is an intangible thing, and the value, in a case of that kind, would have to be guesswork on provisions.' If Edgar Ames continued in the same kind of business after the death of Henry Ames, and solicited business from the customers of the old firm, the value of the good will of the old firm of Henry Ames & Co. would, in Mr. McEnnis' opinion, have been nothing. Mr. Finch was also of opinion that under the circumstances just stated the good will of the former firm of Henry Ames & Co. would have been of no money value. If there was one portion of the firm still in existence and still in possession, the good will would not be of any value to any person to buy it. A brand is worth nothing without being sustained by the individuals who establish it. It

is the men who make the brands in the first place. Such is, in substance, the testimony of the witnesses on the matter at issue.''

This ruling of the referee was approved by the circuit court, and after careful examination of all the authorities cited by counsel on each side, we are of opinion that a correct conclusion was reached below on the facts and circumstances of this case, the law applicable to which seems to be well stated by Judge WOERNER in language as follows:   ''The good will of a firm dissolved by the death of one of its members has often a marketable value, and in such case it is liable to be sold for the benefit of all the partners like any other property of the firm.    In such case it must be taken into consideration in the valuation of the stock, and the proceeds of its sale become assets for the payment of debts or distribution between the deceased and surviving partners.    But it is not always either valuable or saleable.    It is described as the sum which a person would be willing to give for the chance of being able to keep the trade established at a particular place, or rather it is the price to be paid for the advantage of carrying on business either on the premises, or with the stock of the old firm or connected therewith by name, or in some manner attracting the customers of the old to the new business.    Upon the sale of an established business, its good will has, obviously, a marketable value; but this depends largely, if not entirely, on the absence of competition on the part of those by whom the business has been previously carried on.    Hence, since a surving partner is under no obligation either to retire from business merely because the partnership is dissolved, or to carry on the old business so as to preserve its good will until the final winding up of the partnership affairs, its market value is often destroyed or inconsid-

erable." Woerner, Law of Adm., sec. 127, pages 291, 292. We think the evidence supports the finding, and that in this case the good will, subject to the rights of the surviving partner, was of no appreciable value, and the administratrix should not be charged with anything on account thereof.

*E.* In the first annual settlement the administratrix took credit for $330.91, paid Ruggles & Bixler. This credit was approved by the probate court and by the circuit court allowed to stand; and in so doing, the executors contend, they committed error. This amount was paid in discharge of two special tax bills issued under ordinances of the city of St. Louis in due form against the partnership real estate. After the administratrix had paid these bills, the ordinance, in pursurance of which the improvement had been made and the tax bills issued, was held by this court to be void. *Ruggles v. Collier*, 43 Mo. 353. At the time they were paid, they were *prima facie* a lien on the partnership property, which had received the benefit of the improvement, and there is no question but that they were paid in good faith by the administratrix under the belief that the partnership estate was legally liable therefor. The great majority of the property holders in number and amount paid like tax bills against their property in like manner as did the administratrix, and we do not think hers should be held a gratuitous payment, as contended by the executors, for the reason that at the time it was made the circuit court had sustained a demurrer to the petition in the *Ruggles* case and the same was pending in this court on error, of which fact she had no knowledge, having no connection whatever with that case. The evidence does not tend to show that in this matter she did not act with that degree of care which cautious persons exercise in their own business, and this was the meas-

ure of her duty as administratrix. *Jacobs v. Jacobs*, 99 Mo. 427; *Merritt v. Merritt*, 62 Mo. 150. The exception to the credit was properly overruled.

*F.* A credit of $333.64 was also taken and allowed by the probate court in the first annual settlement of the administratrix, being the amount of money paid by her to Voss and Schultz, which was sustained by the circuit court, of which the executors complain. "It appears that in the lifetime of Henry and Edgar Ames they had sold and conveyed by warranty deed a ten-acre tract of land in Illinois, belonging to the partnership; that subsequently one Pausennan asserted and claimed adverse title to a part of said land so conveyed, and that upon the advice of her attorney, Governor Koerner, that the claimant could maintain title to the property and that it would be less expensive to pay the sum aforesaid to buy said outstanding title than to incur litigation in respect of the same, the administratrix paid said sum to said Voss and Shultz." It is not suggested that the compromise was not a wise and prudent one and beneficial to both estates, but that it should have been paid for out of the separate funds of each estate. The objection is purely technical, and we do not feel disposed to disturb the ruling of the probate and circuit courts as to this item.

*G.* The circuit court found that the estate of Henry Ames, deceased, is indebted to the partnership estate of Henry Ames & Company in the sum of $5,394.77, being interest at the rate of six per cent per annum on the sum of $29,815.08, advanced and paid to said estate of Henry Ames, deceased, out of the funds of the partnership during the life of Edgar Ames, as appears by the report of the referee, and deducted one half of the amount so found from the distributive share of Henry Ames. Although in May,

1870, it was formally agreed in writing between the administratrix and the executors that said principal sum was the true amount advanced, as aforesaid, and that it should be so charged by the probate court; and thereafter, on the seventeenth of June, 1870, in pursuance of that agreement, it was by the judgment of said court so charged, and the same has remained unchallenged from that time until the filing of the motion for a new trial, as a basis for the present appeal by the executors, they now contend that a mistake was made in the amount of said principal sum, which they contend should have been $21,311.73, instead of $29,815.08, whereby the administratrix obtains a credit of $8,503.35 in excess of what should be allowed on the principal sum and credit for a corresponding excess on account of the interest thereon, the sum of which is the amount charged by the court aforesaid, and two items of interest charged in the account of Henry Ames, amounting to $857.80. This contention is based upon a misconception of the facts disclosed by that account, from which it appears that the amount of the cash advanced, exclusive of interest charges, was exactly the sum of $29,815.08; and that the executors were right when they agreed that that was the true amount. The probate court was right when it adjusted the account upon that basis and the circuit court was right in thereupon making the interest charge aforesaid. The misconception doubtless arose from taking the balance shown by the account, instead of the cash advances, as the basis of calculation, unmindful of the fact that there entered into the balance a debit to Edgar Ames of $10,000, the value of the personalty bequeathed by Henry Ames to his wife, for which no corresponding credit was therein taken.

*H.* It is next urged that the circuit court committed error in sustaining the referee in overruling the

exception of the executors as to what is known in the record as the "Neal Cotton Matter." After a careful examination of all the evidence bearing on this matter we reach the same conclusion as did the referee. The following extracts from his report discloses the salient facts of this matter about as briefly as can well be done:

"It appears that in the year 1864 there were two hundred and fifteen bales of cotton near Alexandria, La., on the banks of the Red river, in the part of the country where General Banks was then operating with his troops. This 215 bales of cotton Miles Sells, as agent for Henry Ames & Co., bought of Thomas Neal, paying him for it the sum of six thousand dollars. This cotton was soon after seized, taken on board a United States gun boat, and marked 'U. S. N.' Sells, thinking, as he testifies, that the chances for recovering this cotton were not good, sold one half of it to Northrup & Greene for $3,000, and taking Neal's power of attorney to enable him to claim it in Neal's name, preceded the cotton up the Mississippi. This cotton was shipped to Cairo and there subsequently sold and the proceeds paid into the registry of the U. S. district court. On his arrival at St. Louis Sells saw Edgar Ames and related to him what had occurred in regard to this Neal cotton. Sells testifies that he told Edgar Ames of the sale of one half of this cotton to Northrup & Greene; stated that Captain Nanson was to have an interest in the cotton, and further said to Edgar Ames that as Sells & Co.—a firm for whom Sells was acting and trying to get business in the South—had got no business he (Sells) thought that Mr. Ames ought to be willing to give Sells & Co. a part of his (Henry Ames & Co.'s) interest in this Neal cotton. The result of this conversation, according to Mr. Sells, was that Edgar Ames agreed to let Sells & Co. have one third of

one half of the net profits of this cotton; that is, Sells
& Co. were not to pay one thousand dollars, or any
sum, for one third of one half, but this one third of
one half 'was turned over to Sells & Co. without any
consideration at all.' By this arrangement, thus made
between Henry Ames & Co. and Sells, Henry Ames &
Co. were to retain one sixth, Capt. Nanson to have
one sixth, Sells & Co. to have one sixth, and Northrup
& Greene were to retain half, for which they had paid
$3,000. Under the power of attorney which he had
received from Neal, the original owner in Louisiana
from whom this cotton was purchased, Miles Sells filed
a claim to the cotton in the name of Neal, with himself
(Sells) as agent, in the United States district court at
Springfield, Illinois, this cotton having been carried to
Cairo and libelled in the district court for the southern
district of Illinois. Counsel were there retained to
prosecute the claim to the cotton. This was, of course,
in the lifetime of both the Ameses. The litigation
continued and afterward, and in the year 1868, under
decision of the district court, a part of the proceeds of
this 215 bales of cotton, after deductions for military
salvage, costs, etc., was distributed, and in July,
1868, $11,607.49 was paid to the administratrix from
the proceeds of this cotton. As the claim to the
cotton was made in the name of Thomas Neal, the
original owner, and Neal had given his power of attor-
ney to represent him to Miles Sells, the money was
paid over on its distribution to Sells, the distributee
recognized by the court. Sells testifies that he paid
over their respective shares to the parties in interest.
To Crosby, the bookkeeper and agent of the admin-
istratrix, Sells sent on the ninth of July, 1868, a cheque
for $11,607.49 drawn to the order of Henry Ames &
Co. and with it a statement from Sells & Co. to the
effect that of this $11,607.49 the sum of $6,803.74 was

the share belonging to Henry Ames & Co. and $4,803.75 was the share belonging to Sells & Co.   Crosby testifies that on the basis of the statement thus furnished him he made the entries in his books in regard to this distribution of proceeds of this cotton.   About the last of July or first of August he paid over to Sells & Co. the sum of $4,803.75 as their share of this distribution. This sum of $6,803.74 was all that was ever realized to the estate of Henry Ames & Co. from the Neal cotton. With this sum of $6,803.74 the administratrix charged herself in her settlement of the partnership estate filed on the twentieth of March, 1869.

"After this distribution from the registry of the U. S. district court of Springfield, the proceeds of which were received and paid over by Miles Sells, as stated, there was still a large sum arising from the sale of this Neal cotton, the right to receive which evidently involved different points of law, or rested on a different basis, from the previous distribution.   It appears that this 215 bales of Neal cotton was libelled as prize, not by itself but with other cotton. . . . . . . The evidence shows that strenuous efforts were made by way of deliberation and consultation, the parties meeting at Springfield and elsewhere, and consulting attorneys and agents, to get the balance of the money in the registry of court.   The lawyers who had been employed by Henry Ames & Co. had little hope of any further recovery, and it would seem, did not care to prosecute the case further.   It was thought that an act of Congress would have to be obtained to get out of the difficulty which presented itself.   Mr. Sells consulted with Mr. Crosby, as representing the administratrix, and with the administratrix herself.

"The result of it all was that neither Mr. Northrup, nor Capt. Nanson, nor Mr. Goodin, representing Sells & Company, was willing to go on with the case.   The

administratrix took the same position as the others.
The matter was dropped.  Afterward a claim agent
named Corwine applied to Northrup and then to Sells
and wished, on certain terms, to prosecute the case.
This claim agent wanted one half of the amount recov-
ered, his expenses paid, and a retainer of $1,000 or
$1,200.   There were renewed consultations among
those interested, Mr. Sells consulting the administra-
trix again, and the result was that the administratrix
and all the other parties, except Northrup and Miles
Sells, refused to contribute toward the employment of
Corwine for the further prosecution of the claim.
Northrup and Miles Sells employed Corwine, and as
the result of this renewed litigation there was obtained
and paid over to them, in 1872, according to the testi-
mony of Miles Sells, $10,000 or $12,000.   The credi-
bility of Miles Sells as a witness is reflected upon by
the exceptors, but there is nothing that shows that his
testimony is not to be believed.   This testimony of his
was taken in 1887 as to transactions of 1864 and sub-
sequently.  . . . . . . . This cotton business began in
1863.  Henry Ames did not die until August, 1866;
Edgar Ames died in December, 1867.   Both the part-
ners knew Sells and evidently had great confidence in
him, trusting to him the management of this cotton
business.   The evidence shows the brothers left much
to Sells's discretion, as the nature of the business and
money risks attendant upon it required they should
do.   As nearly all, if not all, cotton coming north was
seized for violation of the non-intercourse act of Con-
gress or otherwise, title to it could be asserted only
through claim; and the general, if not the invariable
rule was, that this claim must be made in the name of
the original owner, and that his loyalty to the govern-
ment must be proved.   It is also clear that Henry
Ames & Company did not wish that their names should

appear in these transactions. Miles Sells obtained powers of attorney from the original owners to himself, and Henry Ames & Company during the lives of the two, and Edgar Ames, during his life, intrusted Miles Sells with all matters pertaining to these cotton transactions, of the details of which he alone became cognizant. Under these circumstances it is not strange that the administratrix followed the same course of dealing and put confidence in Sells. He had been before and necessarily remained, after the death of the brothers, the repository of knowledge of which there was no written evidence. When the statement as to the respective interests in the proceeds of this Neal cotton came from him in July, 1868, as to what was due to Henry Ames & Company and what to Sells & Company, the administratrix was dealing with one to whom the brothers had intrusted this business and left all its details. Nor was the amount paid over to Sells & Company at once, or as a matter of course, but time was taken sufficient for investigation. We are not, upon a suspicion that something may have been wrong, to presume such was the fact.

"As to a further prosecution of the claim to this cotton, after the first distribution, the administratrix can not, in view of the evidence, be held guilty of negligence. The counsel employed by the brothers, in their lifetime, considered that there was little or no chance of recovery; nor does it appear that any lawyer ever advised prosecution. The delay that occurred, after full consultation; the refusal at first of all to incur further expense in view of a case considered by lawyers almost hopeless; the subsequent refusal to proceed by any, except two—these things show how the matter was looked upon by the other persons in interest. Only a claim agent presented himself, who insisted upon extravagant terms and who himself refused

to prosecute the claim upon a contingent fee of half the amount. I am of opinion that this second exception ought to be overruled, and that the administratrix ought not to be charged with any amount on account of anything pertaining to the Neal cotton matter.''

To this statement and in support of his ruling it is only necessary to add that it appears from the evidence that neither the administratrix nor her agent, Crosby, knew that Corwine had been employed by Sells & Northrup or that he was seeking to recover or did recover anything on account of this matter until it was disclosed in the testimony of Sells, taken before the referee in 1887; at which time Sells was insolvent, as long before that time he had been.

*I.* It is next urged that the court erred in sustaining the action of the referee in refusing to charge the administratrix with any amount on account of *the Elgee cotton.* The following extracts from the report of the referee exhibit the material facts in that matter:

"In 1864, Miles Sells, the agent of Henry Ames & Co., proposed to buy and Elgee, a Southern planter, to sell a lot of cotton which Elgee had at Bayou Buffalo, Miss., consisting of over two thousand bales. Terms were made, but before any sale could be effected, Elgee reported to Sells that the cotton had been seized at Bayou Buffalo, a part taken away and the rest destroyed. Elgee proposed that Sells should follow the cotton, which appears to have been seized by the United States authorities as abandoned cotton, and gave Sells papers and a power of attorney from him (Eglee), and Sells accordingly followed the cotton, about five hundred and seventy-two bales, to St. Louis. This cotton had been shipped in charge of a U. S. government officer and was held by the authorities in St. Louis. Sells was in constant communication with Henry Ames & Co. Both the brothers, partners in

that firm, were at that time living.   Henry Ames did
not die until August, 1866; Edgar Ames died in Decem-
ber, 1867.   It was agreed between Miles Sells on one
part, he holding the power of attorney from Elgee and
acting for him, and Henry Ames & Co. on the other
part, that Henry Ames & Co. should employ counsel,
furnish the necessary bonds and pay expenses in any
suits or proceedings necessary to recover the cotton,
and upon its recovery pay Elgee at the rate of two
hundred dollars a bale, less half of the money paid for
expenses.   If the cotton was not recovered Henry
Ames & Co. were to lose the sums advanced.   These
terms were complied with by Henry Ames & Co.   A
suit in replevin was brought by Glover & Shepley and
Henry Hitchcock, as counsel for Henry Ames & Co.,
in the name of Elgee, the owner of the cotton, against
Lovell, who held possession of the cotton by virtue of
his seizure for the government.   After various pro-
ceedings, immaterial here, the cotton was sold and the
proceeds deposited with the government to await the
result of the litigation.   This suit of Elgee against
Lovell was decided in the United States circuit court at
St. Louis against plaintiff, during the lifetime of both
the Ameses.  They had an appeal taken to the Supreme
Court of the United States, and while this was pend-
ing, and before decision, both the brothers died.   The
administratrix, after their deaths, advanced large sums,
the necessary fees of lawyers and other expenses, to
sustain litigation.   In January, 1868, the decision of the
U. S. circuit court was affirmed by the Supreme Court of
the United States.   (22 Wall. 180.)   Upon this there
were consultations by the administratrix and by Miles
Sells with their counsel to learn if something further
could not be done as to recovering the proceeds of this
cotton.   Their counsel advised that the matter was at

an end, and that there was no further remedy in the premises.

"It appears that there were various claimants to this cotton, among others one Bouchard; also Mr. D. D. Withers, a creditor of Elgee, who had a judgment against Elgee, as Withers testifies, to the amount of something like a million dollars, while the cotton sold for between three or four hundred thousand dollars. The administratrix introduced in evidence the deposition of Withers, taken as stated below, in New York in 1885. Withers testified that he had an interview in the spring of 1866 with Edgar Ames about this cotton; that the proceedings in the replevin suit were never abandoned, but prosecuted to the end; that he (witness) employed his own counsel to assist Glover & Shepley in arguing the case in the Supreme Court of the United States. After the case had been affirmed in the Supreme Court of the United States a suit was brought for the proceeds of this cotton in the United States Court of Claims in the name of the representative of Elgee, who had died, but through the instrumentality of Withers, and about three hundred and fifty thousand dollars collected and finally distributed through the probate court of the city of New Orleans, where Elgee had lived in his lifetime. This suit, Withers testifies, was practically for his own benefit as he was the only creditor. Withers testifies—and he appears to be a straightforward and trustworthy witness, and is one who is called to the stand by the exceptors—that in prosecuting the suit in the court of claims he had no communication with any party who had prosecuted the replevin suit; that he had never had anything to do with the administratrix, and that she had nothing to do with the suit in the court of claims. It seems clear that the proceeding in the latter court was one undertaken and prosecuted by

Withers for his own benefit. There is no ground in the evidence for a charge to the effect that by this or any proceeding in the court of claims the administratrix received any money or proceeds from this Elgee cotton. . . . . . .

"It appears clearly from the evidence that there was no sale of any part of this Elgee cotton to Henry Ames & Co. At first terms were agreed on between Sells and Elgee, but the cotton was seized and no sale was effected. Afterward the agreement made was still subject to the fact that Elgee could give no possession to the cotton or its proceeds which were held by the government, and claimed by it and by a number of people. The money which was expended by Henry Ames & Co., and afterward by the administratrix, was expended to get the cotton or its proceeds where the contract, or its essential feature, could be put in operation. The suit in replevin was faithfully prosecuted. Mr. Sells repeatedly sought some further proceedings, but, as Mr. Hitchcock says, Mr. Shepley and he regarded the decision as finally disposing of any interest the firm of Henry Ames & Co. might have in the cotton. Mr. Hitchcock told Mr. Sells that there was no way of setting up any further claim to the proceeds of the cotton. There is no evidence showing that after this the administratrix further prosecuted the claim. . . . . . .

"It is a pure assumption to suppose, in relation to the Elgee cotton, that after being defeated in two courts, she could have prosecuted this claim further in the court of claims and there succeeded in recovering a further sum of money upon it. But, however this may be, she had no right to disregard the positive advice of the counsel selected and trusted by the brothers in their lifetime, unless some state of facts existed different from any disclosed by the evidence in this case. In my

opinion this exception on account of the Elgee cotton matter should be overruled and the administratrix should not be charged with any sum by reason of anything shown in this transaction."

That the conclusion reached by the referee is correct, there can be no doubt. The decision of the Supreme Court of the United States in *U. S. v. Woodruff*, 22 Wall. 180, in which the rights of the claimants to this same cotton were considered, and in which it was held that no one except the owner of the property seized and entitled to the proceeds thereof could sue therefor in the court of claims, shows that Henry Ames & Company would have had no standing in that court.

*J.* The executors' next object to the allowance made the administratrix by the referee, and approved by the circuit court, for attorneys' fees paid by her in the protracted litigation growing out of her efforts to make settlement of the partnership estate. It is not contended that the amount allowed was not paid, or that it was unreasonable for the services rendered. There can be no question but that the rights of the parties were conflicting and complicated to an extraordinary degree; and after a careful consideration of the whole record we are satisfied that the administratrix endeavored to faithfully discharge her duties and render a true account of her trust under the most trying and difficult circumstances, and so thinking, we approve the ruling of the circuit court in allowing her credit for attorneys' fees as the same were adjusted by the court. We are also satisfied that the interest account was properly adjusted in the settlement, except in the particular mentioned in paragraph 5 of this opinion.

III.   It follows from what has been said that the circuit court was in error in finding the balance in the hands of the administratrix belonging to the estate of

Henry Ames & Company and subject to distribution to be the sum of $59,971.75; that there should be deducted ·from that amount the following credits, to which the administratrix is entitled:

| | |
|---|---:|
| As found in paragraph 1 of this opinion... ................ | $18,760.00 |
| As found in paragraph 5 of this opinion...................... | 12,508.48 |
| As found in paragraph 8 of this opinion. ................... | 600.83 |
| The total of such deductions being......................... | $31,869.31 |

Leaving as the true amount in her hands belonging to that estate and subject to distribution, the sum of $28,102.44, less a reasonable allowance for legal advice and services since the taking of these appeals.

Wherefore, it is ordered that this cause be remanded to the circuit court with directions to re-adjust the account of the administratrix, make final settlement thereof, and distribution in accordance with the views expressed in this opinion, and that the cost of these appeals be taxed against the executors of Henry Ames, deceased. All the judges concurring except SHERWOOD, J., who dissents.