## Freeman *et al v.* Reagan.

Administration—*Interposition of equitable powers.*—While a court of chancery will not assume to take charge of an administration going on in the court of probate, yet there may arise cases of fraud or waste which would call for the interposition of equitable powers, not exercised by courts of probate.

Where the removal of the administrator, by the probate court, would not show the fraud, nor cancel or shorten the process of cancellation of a deed obtained from the administrator by fraud and duress, nor the grounds of defense be made better or worse, a court of equity, having power to control properly any proceeds that may result from its decree, may interpose.

Fraudulent deed—*When set aside, etc.*—The rule in equity, that a party seeking to set aside a contract, must place, or offer to place the opposite party in *statu quo*, is not applicable to a case where a deed has been obtained by fraud and without a valid consideration.

Practice.—Where a demurrer points out no specific defect in the bill, although allegations that ought to have been made, were omitted in the bill, yet, if the result of the suit, so far as the defendant is concerned, could not have been different, and the decree in the court below is a full and final adjustment of all his rights in the premises; and if those who may be liable to further costs or litigations do not complain, a demurrer ought not to avail the defendant.

### Appeal from Arkansas Circuit Court.

Hon. Wm. M. Harrison, Circuit Judge.

Watkins & Rose, for appellant.

The evidence of duress is confined to Bunyard, but it is not made out. *Burr v. Burton, 18 Ark., 218.*

The answer of Freeman being full, explicit and responsive in denial of the allegations of the bill, it is entitled, as evidence, to its full weight. *Jordan v. Fenno, 13 Ark., 593; Byrd v. Belding, 18 Id., 118; Spence v, Dodd, Id., 19, 166.*

The complainants, seeking a recision, do not propose to place the defendants in *statu quo* or offer to restore the value of what was paid by him. *Desha v. Robinson, 17 Ark., 237; Seaborn v. Sutherland, 17 ib., 603; Bellows v. Cheek, 20 ib., 438;* and this

is the rule even in cases of usury, *18 Ark , 369, 375.* The answer of Freeman contains a clause of demurrer, which is available. *Lovett v. Langmire, 14 Ark, 339; Menk v. Anthony, 11 ib., 711; Sullivan v. Hadley, 16 ib., 150.*

The heirs are competent to maintain this suit; the right of action passed to the administrators. *Anthony v. Peay, 18 Ark., 24; Leman v. Rector 15, ib., 436; Pope v. Boyd 22 ib., 535; Worsham v. Field, ib., 448; 1 Hilliard on Mort. p. 280.*

Payment to the heirs would have been no defense by administrators. *17 Ark , 122; Rust v. Worthington. ib., 129; Slocumb v. Blackburn, 18 Ark , 319; Buck v. Cook, 21, ib., 572.*

The bill should have been dismissed without prejudice to administrators to sue.

*Clark & Williams*, for appellee.

Whether the acts of the administrators were fraudulent, was a question of fact, dependent upon and susceptible of proof, and the Chancellor in determining it, was sitting as a jury, bound to decide according to the weight of testimony— and the case comes clearly within the principle laid down in *Branch v. Mitchell, 24 Ark., 431, 443; Johnson v. Ashley, 7 Ark., 470; 13 Ark., 295; Myers v. State, 7 Ark., 174; Drennen v. Brown; 20 Ark., 138; Mason v. Edington, 23 Ark., 208; Rose Digest, 559,* and cases cited.

The administrators were trustees, acting for the benefit of complainants, as the heirs of the estate, and as such were bound to the utmost good faith towards the interests of the *cestui que trust.* See *Jackson v. Repdegraff, 1 Rob. Va. 107; Nichols v. Peak, 1 Beasely (N. J.) 69; Barksdale v. Finney, 14 Gratt (Va.) 338; Hargraves v. Batty, 19, Geo., 130; Morris v. Thompson, 19 Ill., 112.*

The deed was not in accordance with the order made, and was never confirmed in any manner by the court—and was not valid. See *1 Kage 2 and p. 60, 61; Darkin v. Marze 1, as v. 22; 1 Town & v. 406; 2 Daniel. 1454-5; Act 21st February, 1859; 1 Sugdon, 264, 265, 266; 4 Trent, 330,* and cases cited.

GREGG, J.

The appellees brought their bill in equity, against the appellant and others, to the May term, 1867, of the Arkansas circuit court.

It is alleged in the bill that Lewis Thompson, now deceased, on the 21st day of October, 1868, sold certain lands to appellant for $3,840, executed his bond for title, and took three bonds for the purchase money, each for $1,280, due respectively the 25th of December, 1859, 1860 and 1861; that the first bond was paid, but the others have not been paid; that Thompson died in 1862, leaving a widow, and the complainants, his heirs; that, in May, 1862, letters of administration were granted his widow and Larkin F. Bunyard, upon his estate, and that appellant and others, at the July term, 1863, of the probate court, fraudulently procured an order for said administrator and administratrix to make a deed to the appellant; that the deed was made; that lawful money was not paid, as provided for in the bond; that through duress and to avoid conscription into the rebel army, the administrator received Confederate notes and executed a deed, the notes being worthless; and that the widow, who has since died, also signed the deed through fraud and undue influence.

The appellant answered, admitting the contract for the lands, the execution of the obligations, the payment of the first bond, the death of Thompson and wife, the grant of letters of administration, and the making of the probate court order and the deed, and that complainants are the heirs, etc.; but he denies all frauds and confederation to obtain the title; alleges payment of the obligations, and that the deed was duly made.

Bunyard's answer admitted all the material allegations in the bill.

The court below decreed in favor of the complainants, but allowed Freeman ten cents on the dollar for the amount paid. Whether or not the allowance of that sum was error, is a question not before this court, because no appeal was taken or com-

plaint made by the parties against whom that allowance was made.

The validity of the deed and the payment of Freeman's last two obligations are the questions before us—one party alleging that only Confederate notes of no value had been paid, and that the deed was obtained through fraud; the other, that full consideration had been paid and the deed fairly obtained.

The substance of the proof is that Freeman made no attempt to pay off his indebtedness until the summer of 1863, when the Confederate States' notes were rapidly declining in value; he then showed anxiety to pay such notes at their face value. Bunyard and the widow refused to accept. Freeman told them he would spend all he was worth before he would pay anything else; and he employed Colonel Morris, the sheriff of the county, and who was secretary for the administrator and administratrix, to influence them to take these notes, and make him a deed. Bunyard told Morris he thought they would be of no account, and the widow refused to take them. Bunyard had been keeping out of the Confederate army. Armed conscripting squads were scouring the country. Bunyard was frightened and hiding, and men believed themselves in danger of great personal violence if they refused to accept Confederate notes as current money, which then were estimated as being worth about ten cents on the dollar; yet no one was known then to refuse them for debts or property.

No direct threats of violence were made against Bunyard. Morris told them they could get nothing but Confederate money; that Freeman had the advantage of them, and that it was that or nothing.

He swears that Mrs. Thompson was a woman of weak mind, and he used every effort he could think of to get her to sign the deed. Finally he got her to go to town to get the money. He asked her to give bond for the return of the money, etc., and she refused, and burst out to crying.

When Bunyard refused to act, Morris told him it would be better for him to take the money and execute the deed. If he

did, he thought "he would not be pestered," as Bunyard swears, he understood he would not be conscripted, and that he believed Freeman and Morris could have him taken to the army or saved from conscription. No willingness was expressed, but no further objection was made. Freeman had the deed written and sent to him, where he was secreted in the brush, and he there signed and acknowledged it.

The deed was very informal and did not properly recite the contract with Thompson, in his lifetime; the appointment of his administrators; the making of the probate court orders; etc., but, taken in connection with the orders shown to exist, it sufficiently shows the character in which the grantors conveyed; especially so, when both parties allege that the deed was made in their representative character, and proofs, *aliunde*, show that fact.

Upon these facts the chancellor found for the complainants, but allowed as a credit ten cents on the dollar on $2,705 by Freeman, paid to Bunyard, in Confederate and Arkansas State treasury warrants, and decreed that the deed be cancelled; that Freeman pay the balance of the purchase price; that the same be a lien upon the land, and that a commissioner sell the same, if payment is not made, etc. From which decree Freeman has appealed to this court.

The appellant makes some technical objections against a recovery. That these heirs are not legitimate complainants; that there is no offer to return the sums paid; etc., and then, that no sufficient fraud is shown on the part of the appellant to avoid the deed made him, and that the acceptance of the Confederate money was a consummation of the agreement made between himself and Thompson; and, being a contract executed, cannot now be inquired into or attacked for want of consideration.

There can be no question but the heirs are vitally interested in the preservation of the effects of the estate, and, while they might well have applied to the probate court to have removed a faithless administrator, we are slow to hold that there is no

other court competent to relieve against any of the numerous frauds that may be practiced against estates in the hands of faithless, incompetent or corrupt administrators; and while a court of chancery will not assume to take control of an administration going on in the court of probate, we think there may arise cases of fraud or waste which would call loudly for the interposition of equitable powers not exercised by courts of probate.

In this case the removal of the administrator would not have shown the fraud nor have canceled the deed, nor would the process after that to a cancellation of the deed been any shorter than the course pursued in this suit; nor would the appellant's grounds of defense been made better or worse, and we see no want of power in a court of equity to properly control any proceeds that may result from the decree, or orders, or process upon such decree as shall be rendered in doing justice between the parties.

The appellant places stress upon the rule that those in equity, attempting to set aside a contract, must place, or offer to place, the opposite party in *statu quo*, returning, or offering to return, what may have been received. We fail to see the application of the rule in this case. The complainants ask to set aside a deed because it was obtained through fraud, in violation of a contract that they were ready and willing to abide by, and without any consideration, upon a mere pretended payment in worthless paper.

If a trustee conveyed away valuable property to which they were entitled, for worthless and illegal notes, they could offer to return nothing upon asking to cancel the deed; and especially so, when such notes are in the hands of one of the defendants.

In answer to the bill the appellant responded that the allegations of confederation and fraud were wholly untrue; and it is insisted that such answer is responsive to the bill, and is entitled to full consideration and weight before the court. That is not questioned, but, like other testimony, it is subject to such criticism as the circumstances justify; and in this case

we would infer the chancellor examined it with some severity. He answers that the administrator was at perfect liberty to act in the premises, without any compulsion on his part or otherwise. He could with propriety respond as to the influences he brought to bear on him; but, where others are charged with aiding in the duress, and respondent responding that he himself was not present, how then did he know the administrator acted with perfect freedom? Yet he unequivocally asserts that as a fact. He answers that the order, authorizing the execution of the deed, was obtained by the grantors on their own motion, and without his knowledge. How could he positively answer that the order was made on their own motion, when in the very same sentence he declares he had no knowledge of the making of the order? The assertion of facts that could not have been within his knowledge, gave the chancellor room to doubt like assertions of matters that might or might not have been within his knowledge.

He responds that Confederate money was current, etc. To assert that these notes were current, does not well comport with the testimony of the witnesses. He further avers that the grantors were not only willing, but anxious to receive such currency in payment for the land. Weighed with the other evidence, the chancellor may have thought this wilfully untrue. If they were anxious to receive such Confederate notes, why did respondent express his gratitude to Colonel Morris for influencing her beyond what any one else could have done? These responses were made not as beliefs, but as facts.

No steps to pay were taken before or soon after Thompson's death; but when the death of the Confederacy seemed approaching, and her notes had gone down to ten cents on the dollar, the appellant became quite active in his demands for title, and, with the unusual influence of Colonel Morris, he pressed this matter to a conclusion.

Armed squads were scouring the country and forcing into the Confederate ranks all who were able to carry a musket or answer at fatigue call. In this condition of things, much less

than an ordinary effort would reach the fears and control the actions of such men as Bunyard; and such influence as was brought to bear on the widow, seemed sufficient to control her judgment and induced her to do what she would not have done, if properly advised and protected.

The testimony shows that Bunyard was a timid man, whose fear of death or injury would have influenced him to any pecuniary sacrifice, rather than assume the responsibility of a campaign in the army; and, when convinced that the act would save him from conscription, he executed the deed and surrendered Freeman's obligation.

In the case of *Strayhorn v. Giles*, our court said: "Fraud avoids a contract *ab initio*, both at law and in equity, whether committed by the party himself or his authorized agent." *22 Ark., 517.*

Judge STORY says: "Actual or positive fraud include cases of the intentional and successful employment of any cunning, deception or artifice used to circumvent, cheat or deceive another." *1 Story Equity Jurisprudence, 186.*

Mr. Bouvier, in his Law Dictionary, says: "Positive fraud consists in doing oneself, or causing another to do, such things as induce the opposite party into error or retain him there."

The widow's ignorance, Bunyard's cowardice and readiness to forfeit a valuable estate to save himself from hardships and danger, might be viewed with less sympathy if they had been conveying away their own individual property, and they alone were to suffer from their stupidity or cowardice; but a court of equity cannot wink at their attempt to consume a trust fund in their hands for the benefit of persons then unable to protect themselves.

The evidence not only shows appellant's consent to obtain this property without consideration, other than illegal and almost worthless notes, but that he was the moving, active agent in producing that result, fully cognizant of and party to the fraud.

The demurrer clause in the appellant's answer, points out no specific defect in the bill.

We are of opinion the bill should have alleged that the amounts of these obligations should be paid to a properly qualified administrator, for the extinguishment of such demands as may have been legally probated, and the residue to be distributed among the heirs, or that all such demands had been paid, the administration closed, and that the same were due them as heirs.

In either event, however, the result of this suit, so far as the appellant is concerned, could not have been different; and to order a rehearing could not shorten litigation; and whether or not this is a final settlement of all the matters connected with this litigation, is of but little concern to him; it is a full and final adjustment of all his rights in the premises; and if further controversy arises between the heirs and legal representatives of Thompson, as to the distribution of the proceeds of this suit, this appellant will not be a party thereto; or in any manner liable therein; and the court below certainly has ample power to require such bond, of any commissioner appointed therein, as will well secure the proceeds until competent proof be legitimately brought before that court to show whether an administrator or the heirs are entitled thereto, and the same paid out accordingly. And if those liable to be involved in further litigation and costs do not complain of such defect, we are inclined to hold that one not affected by it cannot complain; and hence, the appellant's demurrer, here urged, ought not to avail him, and that the decree of the court below ought to be affirmed, with directions to that court to require a commissioner, under sufficient bond, to proceed to collect the amount decreed, with interest, and to pay the same over to such parties *only* as that court may direct.

With these directions, the decree is affirmed.

HARRISON, J., being disqualified, did not sit in this case.

HON. S. R. HARRINGTON, special Supreme Judge.