ROWELL and others, Respondents, vs. ROWELL, Adminis-
trator, and others, Appellants.

*March 23—May 10, 1904.*

*Sale by administrator to himself: Remedies of distributees: Find-
ings of fact: Partnership: Appropriation of firm assets by sur-
viving partner: Accounting to heirs of deceased partner: Ele-
ments and value of good will: Profits from converted property:
Allowances for services, patents, etc.*

1. Although the legal title to the personal property of an estate
   vests in the administrator, yet if he fails to protect the bene-
   ficial interest therein of the legal distributees, or himself in-
   vades that interest,—as by a transfer of the property to him-
   self individually, either fraudulently or otherwise,—such
   distributees may sue in equity to protect their rights, making
   the administrator a defendant.
2. If, in such a case, there is no necessity for enforcing the legal
   right of the administrator for the benefit of creditors or others,
   the circuit court may disregard the mere temporary legal title
   and pass the recovery, money or property, directly to those ulti-
   mately entitled thereto.
3. Upon a sale of property by an administrator to himself, if there
   is no proof of any profits made by him therefrom, he is prop-
   erly chargeable only with its reasonable value.
4. Where a referee makes no finding on a subject upon which evi-
   dence was given before him, the trial court may properly sup-
   ply a finding thereon, and the rule as to when the trial court
   should disturb the findings of a referee has no application to
   such a case.
5. Where a surviving partner, being also the administrator of the
   estate of the deceased partner, has sold and transferred prop-

erty of the firm to himself or to a corporation which he so controls that the sale is practically to himself, such sale is voidable at the choice of those for whom he was fiduciary, whether or not there was any conscious purpose to defraud them, and they may hold him to account for all profits realized from their share of the firm assets so transferred.

6. In an action in such case by the widow and children of the deceased partner, wherein a part of the relief grantable consisted in decreeing plaintiffs to be part owners of the corporation, and it was prayed that any further distribution of profits in exclusion of them be restrained, stockholders in the corporation who received their stock from the surviving partner were proper, if not necessary, parties, although no specific money recovery against them was demanded.

7. Since, in such case, the partnership property was, in legal effect, not sold to the corporation, but nevertheless was appropriated and was used by it in its business, it must be deemed to have entered into that business as capital, and any profits earned are to be attributed to such property, according to its value, to the same extent as to the capital of the corporation contributed in money.

8. The good will of the partnership having been appropriated by the corporation, its value should be determined and should be treated as a contribution to the capital of the corporation, the same as other firm property taken for its business.

9. So far as a firm name consists merely of the names of existing individuals, there is not such property in it as to prevent surviving or outgoing partners, after a sale of the business and good will, from using their own names in a similar business, so long as they do not, by the structure of a new firm name or otherwise, convey the idea of their identity with or succession to the old concern; and the successors to the old business must not, without express agreement, so use the old firm name as to convey the idea that the retiring individuals are still connected with it.

10. The implied license which a firm may have to manufacture under patents belonging to individual partners, on the ground that they were issued to such individuals while in the employ of the firm, is not a partnership asset which can be sold to a stranger.

11. The evidence in this case is *held* to sustain a finding of the trial court that the value of the good will which, with other partnership property, passed to the corporation, was $35,000. Dodge, J., and Cassoday, C. J., dissent.

12. In determining what share of the profits of the business of the corporation should properly go to those interested in the estate of the deceased partner, the court should inquire to what ex-

tent such profits are attributable to the personal services of those conducting the business, and make an allowance accordingly—the burden being upon those who wrongfully appropriated the firm property to prove with reasonable clearness and certainty what part of the profits is due to other sources than said property.

13. Where the profits of a corporation were measurably due to the use of patents belonging to individual members of the old firm, a deduction should be made on that account, in ascertaining the amount of profits attributable to the appropriated assets of the old firm.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Modified and affirmed.*

About 1855 *John S. Rowell,* a mechanic and steam engineer, commenced manufacturing seeders and some other farm implements in a small way at Beaver Dam, Wisconsin, and continued throughout a series of partnerships down to the times involved in this controversy; each partnership containing his own name, and sometimes that of his partner. A nephew, Ira Rowell, the ancestor of the plaintiffs, commenced association as early as 1865, continued up to 1874, when he withdrew, and *John S. Rowell* associated himself with his two sons, *Samuel W.* and *Theodore B. Rowell,* and one Merritt Greene. In August, 1875, Ira Rowell again bought out the interest of Greene, to wit, one quarter interest, and thenceforward the firm consisted of *John S. Rowell,* his said sons, and Ira, under the firm name of J. S. Rowell Sons & Co. That business continued up to the death of Ira Rowell in July, 1886, except that during the last few years he had ceased to give it much personal attention or to draw any salary therefrom, the other three members of the firm drawing a salary of $1,200 each; the firm using various improvements upon machines which had been invented and patented by *J. S. Rowell,* without any question of their right so to do, or of the payment of royalty to him; the improvements having been invented by him while a salaried member of the

firm, and by the use of its materials and workmen. The business was conducted upon real estate in Beaver Dam owned in common by *John S.* and Ira Rowell—three fourths by the former and one fourth by the latter.

Upon the death of Ira Rowell, *John S.* was appointed administrator of his estate, and, by mutual consent between himself and the widow of Ira, continued the business in the same way. In 1888, about October 1st, learning or understanding that the widow of Ira Rowell desired that his interest be withdrawn from the partnership business and set apart to her and his children, he undertook to accomplish this result by selling the tangible assets, at a price fixed by appraisers selected by him, in such a way that he and his two sons could go on with the business without the interest of Ira Rowell's estate therein. To accomplish this, at the suggestion of one of his bookkeepers, articles of incorporation were filed, signed by *John S., Samuel W.,* and *Theodore B. Rowell,* under the name of the *J. S. Rowell Manufacturing Company,* with an authorized capital of $100,000. He caused an inventory to be made of the manufacturer's stock and of completed and partially completed implements on hand, which, taken at cost, amounted to $15,477.07, and all the machinery and tools, amounting to $5,355, which total of assets, $20,832.07, he mentally transferred to the new concern for that sum; no conveyance then being made, but the amount being credited as a debt from the new concern to the old firm, and afterwards paid, with interest. As a part of the same plan, *J. S. Rowell* put in as capital, in money, $40,000, on and within a few months after October 1, 1888, at such dates as to make its present value on October 1, 1888, $39,156.97. The credit assets of the old firm, consisting of money indebtedness and of what were called "commission accounts," for machines which had been shipped to, and were in the hands of, agents, were set apart in the hands of an employee for collection and division of net proceeds after pay-

ing the debts of the old partnership, which purpose was duly carried out; one quarter of the net proceeds thereof being paid to *J. S. Rowell* as administrator. As to that liquidation no question arises.

Upon payment of the $40,000 by *John S. Rowell* as capital, he treated himself as entitled to $40,000 of the capital stock of the new corporation. As to the further organization, no steps were taken for several years; no written subscription to stock being made, and no certificates being issued. He, however, mentally, with due expression of that purpose, gave one quarter of the interest thus acquired to each of his two sons, and one eighth to each of two children of a deceased daughter; being the defendants *Bert S.* and *Belle M. Barber.* No break was made in the doing of business; all of the affairs being conducted in the same office as before, where were all the records, books, etc., of the old company, and in the same plant, with the use of the same machinery, buildings, powers, etc., which had been used by the old firm. At the same time *John S. Rowell* mentally proposed to lease to the new concern the real estate, which mental act was confirmed some years later by the making of a lease by him personally and as administrator, and as guardian of the minor children of Ira Rowell, which he was not, at a rental of $1,000 a year, for the estate's share of which he has charged himself as administrator. Said lease included the "rights, appurtenances, and privileges pertaining to the plant, . . . water rights and privileges included, with all the patterns and patents belonging to and used in and about the business of said plant and manufacturing company." At the time of the making of this lease, too, there was executed a bill of sale confirming the transfer of the personal property which had been inventoried. These papers were confirmatory, however, of a transaction had in September, 1892, at which time a more formal and complete organization of the corporation was had, and in connection therewith certificates of stock were issued for

the original $40,000 of capital, to persons and in propor-
tions in accord with *Mr. Rowell's* original plan, as above
stated, and a stock dividend, so called, for the remaining
$60,000 of authorized stock was issued in the same propor-
tions; and at that time the defendants *Stacy* and *Gangelhoff*
came into the corporation, paid cash to *J. S. Rowell* for cer-
tain amounts of stock, and thenceforward continued as offi-
cers and employees.

The business continued as so organized to the time of the
commencement of this suit, the defendant *Lyman W. Barber,*
the father of the two grandchildren, being employed therein
and standing as the representative of his two children. Dur-
ing all of the times mentioned, *John S. Rowell* and his two
sons devoted themselves to the business, for which they un-
doubtedly had superior qualifications, both as managers and
as skilled mechanics, with inventive ability to meet the ne-
cessity for improvements and modifications of the machines
constructed, so as to meet the competition of other manufact-
urers. A long list of patents for such improvements is shown
by the findings, dating both before and after the death of
Ira Rowell. Salaries were paid from 1886 to 1888 to each
of them at the rate of $1,200 per year. On December 4,
1894, those salaries were increased to $2,400 per year, and
on December 1, 1900, to $3,000. *Stacy* was allowed and paid
$1,500 per year from December, 1894, to July, 1900, and
*B. S. Barber* $1,800 after the last-named date. There was
proof also that many of the patents on inventions by the sev-
eral *Rowells* were used in the business, and were of very
considerable value in attaining results, and, especially as to
certain patents for inventions antedating October, 1888, that
the use of each of them was worth at least $1 for each ma-
chine embodying the invention. At the time of the trial it
was found that the business had been very profitable, and
that, after deducting all indebtedness and the liability to
the plaintiffs, as ascertained, and the considerable dividends

which had been paid to the stockholders, the assets of the corporation were worth nearly twice the amount of the outstanding capital stock, $100,000.

Amongst other assets of the firm of J. S. Rowell Sons & Co. were six pedigreed trotting horses, in which the one-quarter interest of Ira Rowell was inventoried to the county court at $212.50. The administrator treated these horses as they had been before Ira Rowell's death, training and racing them, and thereby incurred expense by April, 1889, of some $1,800. He then applied to the county court for authority to sell the quarter interest in them to himself at the inventoried price, he assuming all of the racing expenses which had meanwhile been incurred; representing by his petition that the inventory was the full and fair value of the horses. The referee finds that the horses were worth at the time of the inventory $3,200, and in April, 1889, $4,200. The evidence tends to disclose full knowledge by *John S. Rowell* of at least these values, and continual insistence by him to prospective customers on a much higher valuation. He was held to account for them at the $3,200 value.

Some time in 1896 *John S. Rowell* presented a final account to the county court, showing amounts received and disbursed, and charging himself with the one-fourth of the bill of sale price of the assets turned over to the *J. S. Rowell Manufacturing Company*. This account was settled substantially as stated, and a final order entered, which, however, on petition of the plaintiffs and by stipulation of the parties, was set aside in May, 1898. Meanwhile *George F. Martin* had been appointed general guardian of the minors, and had accepted certain articles of property as payment upon their share of the estate, including certain notes and stock of a local cotton mill corporation.

The plaintiffs, who are the widow and children of Ira Rowell, claiming not to have learned of the attempted disposal of the estate's interest in the partnership until some

time in 1897, commenced this suit December 31, 1898, for the purpose of charging the administrator with various acts of mismanagement, and, as a trustee, with a proportionate share of the profits realized in the manufacturing business from the use therein of the assets of the old partnership. The other defendants, except *Martin,* were joined as colluding with *John S. Rowell* in the acts of misappropriation of said assets and in the enjoyment of the proceeds thereof. The guardian, *Martin,* who, by the way, had resigned as such, was sought to be compelled to tender back to the administrator the cotton mill stock received by him, to the end that the administrator might be required to pay money instead thereof.

The action was referred to a referee, whose findings were in all respects confirmed by the trial court, except that the latter added thereto a finding that the purchase of the horses by the administrator was characterized by actual fraud. Those findings present substantially the facts above stated, with many other details not necessary of statement here, and, as conclusion, the court adjudged *John S. Rowell* liable to account for the profits realized out of the use of the interest of Ira Rowell's estate in the former partnership property, treating the same as capital originally contributed to the business of the *J. S. Rowell Manufacturing Company,* as against the $40,000 money capital contributed by *John S. Rowell,* and, to accomplish this result, that all sums drawn out by way of dividends from said business should be offset by a payment of a proportional amount to the plaintiffs; that a certain sum paid by the corporation for expenses of this litigation be treated in the same way, and, after such payments as were necessary to equalize payments received by other stockholders, that plaintiffs should be decreed owners of a proportionate share of the corporation; such decree to be effectuated by requiring *Rowell* and his two sons to turn over to them the ascertained proportion, being approximately one seventh of the total stock of the corporation. The circuit

court ascertained the amounts for which *Rowell*, as adminis-
trator, was liable to the several plaintiffs, the return to him
of the cotton mill stock being so decreed, and adjudged that
the decree so entered should constitute a full and complete
supersession of an accounting in county court, both by him
and by the guardian, *Martin*, and a full and complete settle-
ment of their respective trusts in that court.

*J. M. Olin* and *H. L. Butler*, attorneys, and *S. W. Lam-
oreux*, of counsel, for the appellants.

For the respondents there was a brief by *Malone & Miller*
and *Timlin & Glicksman*, and oral argument by *W. H. Tim-
lin* and *J. E. Malone*.

Dodge, J. I. *Demurrer*. Defendants separately demurred
on all grounds authorized by the statute, except jurisdiction
of the court, but upon this appeal seem to insist only on in-
sufficiency of facts alleged to state a cause of action, and
under that head to only contend on behalf of the three *Row-
ells* that plaintiffs show no right of action in themselves, be-
cause they, as heirs or distributees, have no title to any prop-
erty left by Ira Rowell; all title to such property being vested
in the administrator. Doubtless the law is so as to the legal
title to any specific personal property. *Meyer v. Garthwaite*,
92 Wis. 571, 66 N. W. 704; *Hill v. True*, 104 Wis. 294, 80
N. W. 462. Nevertheless the equitable beneficial interest in
all property of a solvent estate is in the legal distributees dur-
ing the whole period of administration. If that interest is
invaded, they must have the right that a court's aid be in-
voked. Primarily and ordinarily that right is sufficiently
protected by the power and duty of the administrator to bring
suit to protect or reclaim any property of the estate. When,
however, he allies himself with the wrongdoer, and serves as
an obstacle to, instead of a protector of, the rights of his *ces-
tuis que trustent*, courts of equity have no hesitation in recog-
nizing the equitable interests of the latter as sufficient to give

them standing as plaintiffs in a suit to accomplish that which the administrator ought with all diligence and good faith to pursue, but will not. Such case is entirely analogous to that of any other holder of legal title, with fiduciary duties, who refuses to take the proper steps to protect the property. Those who must suffer ultimate injury may sue in equity to protect themselves. This principle applies between the corporation and its stockholders; the municipal corporation or officers and the taxpayers; the trustee and the *cestui que trust.* 1 Story, Eq. Jur. § 579 *et seq.; Freeman v. Reagan,* 26 Ark. 373; *Haag v. Sparks,* 27 Ark. 594; *Cook v. Berlin W. M. Co.* 43 Wis. 433, 447; *Land, L. & L. Co. v. McIntyre,* 100 Wis. 245, 256, 75 N. W. 964; *Webster v. Douglas Co.* 102 Wis. 181, 189, 77 N. W. 885, 78 N. W. 451; *Luther v. C. J. Luther Co.* 118 Wis. 112, 94 N. Y. 69. In certain aspects this is no more than the exertion of the power of a court of equity to compel the recalcitrant fiduciary to bring such an action as he ought. The fact that he is named as defendant, instead of plaintiff, is no obstacle to rendering exact justice, even as measured by strict legal rights and remedies. If for any reason the legal right of the administrator ought to be enforced—as, for example, where the estate is not fully administered and creditors need to be protected—any recovery can be decreed payable to the administrator, to be applied and accounted for by him as such. If there be no such necessity, the circuit court, under its plenary jurisdiction to do all that the county court could, may disregard this question of mere temporary legal title, and pass the recovery, money or property, directly to those who would be entitled to receive it from the administrator were he first vested with it. *Bassett v. Warner,* 23 Wis. 673; *Hawley v. Tesch,* 72 Wis. 299, 39 N. W. 483; *Weld v. Johnson Mfg. Co.* 86 Wis. 552, 57 N. W. 374; *Meyer v. Garthwaite,* 92 Wis. 573, 66 N. W. 704; *Gianella v. Bigelow,* 96 Wis. 185, 71 N. W. 111; *Morey v. Fish Bros. W. Co.* 108 Wis. 520, 84 N. W. 862; *Gager v. Paul,* 111 Wis. 638, 87 N. W. 875.

Further special insistence is placed on the separate de-
murrer of the *Barbers* and *Stacy* and *Gangelhoff,* against
whom no complicity in the fraudulent purpose is alleged.
They are all stockholders in the corporation, recipients of
their stock from *John S. Rowell,* and have shared in the
profits which have been distributed. Part of the relief granted
and grantable under this complaint consists in forcing the
plaintiffs in as participants in the ownership of this corpora-
tion, and therefore entitled to share with all stockholders in
deciding its business policy. *Luther v. C. J. Luther Co.,
supra.* Further than this, relief is prayed by way of restrain-
ing any further distribution of profits in exclusion of plaint-
iffs. While no specific money recovery is demanded against
these appellants, it is entirely plain that they are interested
in, and likely to be affected by, the adjudication sought, and
are proper parties, if not necessary ones, and their demurrer
was properly overruled. *Hausmann Bros. Mfg. Co. v. Kemp-
fert,* 93 Wis. 587, 591, 67 N. W. 1136.

II. *Merits.* The most important general question on which
rests the whole theory of the judgment turns upon the find-
ing of the trial court that *John S. Rowell,* as administrator
and also as surviving partner, sold and transferred to him-
self as an individual, in conjunction with his sons, certain
property of the old partnership, J. S. Rowell Sons & Co., in
which the estate of Ira Rowell owned a quarter interest; that
such transfer is voidable at the election of these plaintiffs;
and, that being voidable, but the property having gone out of
existence, they have a right, in their choice, either to a fair
price for such property, or to the profits which such purchaser
has realized from it. We have intentionally stated this ques-
tion so as to eliminate every element of actual fraud or of
inadequacy of price as not material in applying general rules
of law at this stage of the discussion.

As to the finding of fact, there is practically no dispute
save in certain details. *John S. Rowell* was clearly in an
autocratic position. The business had started with him, and

through all the change of personnel the several partnerships had been dominated by him. His whole conduct indicates that, while he was glad to yield management of certain detail branches of the business to one or another partner, he never conceived that he was in any way hampered or restricted in acting on his own judgment and will in matters of general policy. His two sons seem to have viewed the situation in the same light, and to have been ready at all times to join in whatever he deemed best. In 1888 he learned, as he testifies, that the plaintiffs wanted their interest in the partnership reduced to money and paid to them. He proceeded to accomplish this by setting aside the bills and accounts receivable to be collected, and by transferring the rest of the assets to some purchaser combination, of which the estate should not be a part. So far, of course, his conception both of his duty and power, whether as administrator or surviving partner, was unassailable, at least by these plaintiffs; and, had he sold such remaining assets to a stranger at a fair price, he doubtless would have been within his right and duty. The transferee, however, was not a stranger. In practical legal effect it was himself. With no very clear idea of what constituted a corporation, he caused to be filed articles incorporating the *J. S. Rowell Manufacturing Company,* but the actuality of that so-called corporation was at first no more than the name. He put in approximately $40,000 of money, with the mental purpose that it should constitute the whole capital, and that stock should be issued therefor, which purpose was carried out in form some years later. True, he did not take all this stock in his own name, but gave one fourth of it to each of his sons, and one eighth to each of the *Barber* children, his grandchildren; but it was all issued for the $40,000 which he put in, and on his direction. This division of stock was but mental at first, effectuated formally when the stock certificates were issued, but for purposes of this case we may overlook all such informality and treat it as made in

1888. That is the most favorable view for appellants. Never-theless the whole ownership of the new concern—corporation or what—at the beginning was in *John S. Rowell,* to retain or give away as he saw fit. It was to that concern the prop-erty of the old partnership was turned over. True, such prop-erty was not taken by the new concern as capital, according to *J. S. Rowell's* mental conception of the transaction, but by way of purchase at a price which was to constitute a debt of the so-called corporation to the old firm. No refinement or distinction can make of this anything but a sale by *John S. Rowell* in one or the other, or both, of his fiduciary capaci-ties to himself as an individual; the two sons co-operating in the purpose, in the act of selling, and in sharing the benefits of the purchase.

To such a transaction the rule of law applicable in this state has nothing of uncertainty. The sale is valid or void-able at the choice of those for whom he was fiduciary, and that, too, without regard to any conscious purpose to wrong or defraud them. *In re Taylor Orphan Asylum,* 36 Wis. 534; *Cook v. Berlin W. M. Co.* 43 Wis. 433; *Pittsburg M. Co. v. Spooner,* 74 Wis. 307, 320, 42 N. W. 259; *Hutson v. Jenson,* 110 Wis. 26, 40, 85 N. W. 689; *Ludington v. Pat-ton,* 111 Wis. 208, 239, 86 N. W. 571; *Harrigan v. Gilchrist,* 121 Wis. 127, 99 N. W. 909. These authorities also fully sustain the rule that the beneficiary may in such case hold the fiduciary to account for all profits he has actually realized from either use or ultimate disposal of the trust property. In addition, of course, he must respond for the full value of the property, if he has disabled himself from returning it. We must therefore conclude that the general theory of this judg-ment, to the extent at least of awarding plaintiffs the profits realized from their share of the assets of J. S. Rowell Sons & Co., which were transferred to the so-called corporation, is warranted by the facts and the law. Of the details of such judgment we will speak later.

Rowell v. Rowell, 122 Wis. 1.

The same principles of law apply to the sale of the estate's interest in the horses by *John S. Rowell,* as administrator, to himself; but, there being no proof of any profits made by him therefrom, the plaintiffs were properly limited to a charge of the reasonable value. We have examined the evidence, and are unable to discover that the clear preponderance is opposed to the finding of the referee and the circuit court as to such value, which, as might well be expected, is in much conflict. Nor are we able to conclude that the finding by the court of actual fraud in this transaction can be set aside. It appears that *John S. Rowell* had full knowledge of the true value, and had often insisted on values for some of the horses much in excess of even that fixed by the referee. If he knew that the price paid was less than true value, but by his affidavit asserted the contrary to induce the county court to authorize sale, actual fraudulent intent is a legitimate inference of fact. Counsel argues this question as if the trial court had reversed a finding of the referee, but that is not the case. The referee made no finding on the subject, and the trial court merely supplied a finding where the referee was silent. Hence the trial court was not acting under the limitation prescribed in *Johnson v. Goult,* 106 Wis. 247, 249, 82 N. W. 139, and *Remington v. E. R. Co.* 109 Wis. 154, 159, 84 N. W. 898, 85 N. W. 321. The question is material only from a sentimental point of view, for the rights of the parties would be the same in either case.

The next general proposition upon which the judgment rests is that since the assets of the partnership were, in legal effect, not sold to the new concern, but nevertheless were appropriated and used by it in operating its business, they must be deemed to have entered into that business as capital, and that any profits earned are to be attributed to such assets, according to their value, to the same extent as to the money capital contributed by *John S. Rowell.* This is logical, and,

we are satisfied, involves no fallacy. We approve it as correct. *Painter v. Painter* (Cal.) 36 Pac. 865.

Obviously, in applying the general principles just stated, the first question for examination must be the true money value of the partnership assets absorbed into the business of *John S. Rowell,* done under the name of the *J. S. Rowell Manufacturing Co.* This occurred October 1, 1888. Up to that time the business of the old partnership was continued, by consent of all parties, upon the same terms as before Ira Rowell's death; and we can discover no reason why equitably, in the light of this understanding, binding as an agreement at least upon the survivors, the interest of the estate was not exactly the same as if Ira Rowell had lived to that date and then died. This question of value of the assets is the point of most vigorous controversy, and includes in it the issues most earnestly debated. The property taken included, first, the manufacturer's stock, completed and partially completed machines, and the assortment of extra parts of machines, valued, by inventory taken at cost, at $15,477.07; secondly, the tools and machinery, inventoried at $5,355; thirdly, the patterns, office furniture, records, files, correspondence, and all things aiding to completely vest in the new concern all successorship to the old without a break, including therewith the occupancy of the real estate and plant, thus, as the court found, conferring upon the new concern the good will of the old. As to the value of the first two classes of property there is no open question. The court finds them honestly valued, and only respondents seem to question that, but ineffectively, of course, for they reserved no exceptions. The other items were appropriated by *J. S. Rowell* for his new business without any valuation or attempt to pay anything therefor. The trial court placed a value of $35,000 upon what it called the "good will" of the old firm, and thus made a total valuation of all the transferred assets of $55,832.07, as against *J. S.*

*Rowell's* approximately $40,000 of money capital, found to be of present worth October 1, 1888, $39,156.97; thus making the starting capital of *J. S. Rowell's* new business on October 1, 1888, $94,989.04, of which the plaintiffs' contribution was one fourth interest in the $55,832.07, which equaled 14.694 per cent. of the whole. This valuation of the good will as part of the assets of the estate appropriated by *J. S. Rowell* is attacked on numerous grounds: first, the ownership of it; secondly, the limitations upon such as the estate could claim any interest in; and, thirdly, the value in view of such limitations.

That the somewhat indefinite and quite intangible thing or conception known as "good will" belongs to the association of individuals conducting a business, and, if of money value, is an asset of the association, is hardly open to question now. 2 Lindley, Partn. (2d Am. ed.) 439, 443; 2 Bates, Partn. § 658; Parsons, Partn. (4th ed.) §§ 181, 347; Burdick, Partn. 353 *et seq.; Washburn v. Dosch,* 68 Wis. 436, 32 N. W. 551; *Fish Bros. W. Co. v. La Belle W. Co.* 82 Wis. 546, 561, 52 N. W. 595; *Bank of Tomah v. Warren,* 94 Wis. 151, 68 N. W. 549; *Scudder v. Ames,* 142 Mo. 187, 43 S. W. 659; *In re David & Matthews,* 1 L. R. Ch. Div. (1899) 378. From such ownership results the duty of either administrator or surviving partner to exercise due diligence to obtain for such asset, like any other, the best possible price, and to account for it if lost or misappropriated. That *John S. Rowell* did take to himself, in his new concern, whatever of good will the old firm had, cannot be doubted. Every class of property and method of doing business which could serve to suggest successorship, continuance of the same enterprise, was appropriated, except the exact firm name, and the public, as also the selling agents, were notified expressly, by letter heads and otherwise, of such successorship; that the new name meant only the old business. Indeed, all this is not seriously controverted by appellants. Their con-

Rowell v. Rowell, 122 Wis. 1.

tention is that, in valuing the good will, much has been in-cluded which did not legally inhere therein, and many rights which, after a sale of that firm asset to a stranger, would have remained with *John S. Rowell* and his sons, and would have rendered any salable good will of little or no value, have been overlooked. They contend that the only good will with which *John S. Rowell* can be charged is that which a court or an administrator hostile to him could have sold to a stranger without his consent and in hostility to his legal rights. This contention is in general sound, and invites investigation whether the court has gone astray in the respect claimed.

Just what "good will" includes is not easy of definition. Nay, it varies with the customs of the general trade and the character or methods of the particular business. An early definition by Lord ELDON is "the probability that the old customers will resort to the old place." This involved the ancient idea that good will inhered in the premises where the business was conducted, which had some justification when considering an inn, tavern, or theater, as in most of the early cases. This, however, is too limited for modern kinds or methods of business. The habit of people to purchase from a certain dealer or manufacturer, which is the foundation for any expectation that purchases will continue, may depend on many things besides place. Confidence in the quality of the goods, in the facilities of the establishment to fill orders promptly, or in the personal integrity or skill of a dealer or manufacturer, familiarity of the public with a designating name for the product, and probably many other circum-stances, might be mentioned as illustrative. The good will is a sort of beaten pathway from the seller to the buyer, usu-ally established and made easy of passage by years of effort and expense in advertising, solicitation, and recommenda-tion by traveling agents, exhibition tests or displays of goods, often by acquaintance with local dealers who enjoy confi-dence of their own neighbors, and the like. In many in-

stances it costs a large sum, and is valuable as it relieves from a continuance of the above-suggested exertions, at least in any such degree as would be necessary to establish a new concern on a parity. In an attempted transfer of this asset to a new concern, many things assist in greater or less degree to make that attempt effective and the good will valuable. The right of the buyer to hold himself out as succeeding to the former business, to use the old business name, the same kind of advertising matter, stationery, and the like; the ownership of old patterns and patents, so that the product of a factory may be identical in all parts after the transfer; also the right and opportunity to continue at the same town, to have access to and use of the records and files of the old establishment, and thus to avail of the forces of momentum and inertia effective in psychological as well as physical affairs; all these and many other things are important and serve to enhance the value of the good will, especially where they are acquired to the exclusion of any other person. So the absence of any of these rights, or the right of others to share them, is an impairment of the value of the transferable good will, and in probably greater degree an obstacle to finding a customer for so intangible and speculative an asset. A living person *sui juris* in selling the good will of his own business may assure that good will in all of the above respects, and may disable himself from doing any act to impair its value; but every man, and not the less a surviving partner, has certain rights which he did not forever surrender upon entering the partnership, and which cannot be taken from him without his consent. Among these is the use of his own name to designate himself as an individual in whatever business he may engage. The law does not make a man anomalous merely because he was once in a partnership using his name as a part of the firm name. John Smith is still John Smith after such an event. He may sign his letters so, he may bill goods to customers, he may declare by sign or legend

in that name that he is the owner or the maker of the goods he offers for sale, so long as there is nothing to deceive the public into the belief that he is still conducting the old establishment or business. *Fish Bros. W. Co. v. La Belle W. Co.* 82 Wis. 546, 52 N. W. 595. Obviously, therefore, if in a given case the good will of a business were dependent entirely on personal acquaintance with or confidence in an individual, the sale value of that good will would be slight, if that individual were to sever from it and engage in sale of the same articles. So, again, if the product of a manufacturing business depended for its utility or popularity upon patents, a transfer might be of little value to one who could not use such patents.

Appellants claim that all of the opinion evidence for plaintiffs as to value of good will was vitiated and deprived of any weight by at least three erroneous elements in the hypotheses on which based, namely, that in a transfer could be included the exclusive use of the firm name, right to manufacture under patents embodied in the machines theretofore manufactured, and exclusion of the survivors of the firm from carrying on the business of manufacturing and selling similar machines under their own names. The extent to which the first and last of these rights were so owned by the copartnership that they could have been transferred to strangers has already been somewhat suggested. The general rule may be stated that so far as a firm name serves to designate the establishment, and not merely existing individuals, it belongs to the partnership, and can be transferred to a stranger purchasing the business. So far as that name merely consists of the names of existing individuals, there is not such property in it as to prevent the surviving or outgoing partners from using their own names to describe themselves in a new business, so long as they do not, either by the structure of a new firm name or otherwise, convey the idea of their identity with or succession to the old concern. Meanwhile the successors to

the old business must not, without express agreement, so use the old firm name as to convey the idea that the retiring individuals are still connected with it. This rule was originally put on the ground that thereby pecuniary liability might fall upon the retiring partner, but other grounds of equal importance support it—such, for example, that his reputation may suffer by reason of inferiority of goods or dishonorable business conduct, to which he is thereby made ostensibly a party. *Fish Bros. W. Co. v. La Belle W. Co., supra; Williams v. Farrand,* 88 Mich. 473, 50 N. W. 446; *Cottrell v. Babcock P. P. Mfg. Co.* 54 Conn. 122, 138, 6 Atl. 791. There are, of course, multitudinous varieties of firm names to which the foregoing rule is not applicable, as where some arbitrary or fancy name is used, which does not naturally describe any individual (*Myers v. Kalamazoo B. Co.* 54 Mich. 215, 19 N. W. 961, 20 N. W. 545); where the name or names of individuals have continued to be used after their death, so that the name does not designate any existing individual, and has practically become an artificial one, designating nothing but the establishment (*Rogers v. Taintor,* 97 Mass. 291; *Slater v. Slater,* 175 N. Y. 143, 67 N. E. 224). In such cases the right of succession to the business and good will usually carries the exclusive right to use the old firm name, but they are not applicable to the situation in the instant case.

As to the rights in patents issued to individuals while in the employ of the firm, the law in this state is quite well settled, in accord with the federal cases, that the employer in certain circumstances acquires by implication a free and perpetual license to manufacture under the patent at the same factory and in the same business, but not a right which can be assigned to another. *Fuller & J. Mfg. Co. v. Bartlett,* 68 Wis. 73, 31 N. W. 747; *Valley I. W. Mfg. Co. v. Goodrick,* 103 Wis. 436, 78 N. W. 1096; *Slemmer's Appeal,* 58 Pa. St. 155; *Hapgood v. Hewitt,* 119 U. S. 226, 7 Sup. Ct. 193. The rule of the last case has been circumscribed somewhat,

but not so as to affect the present situation, by *Lane & B. Co. v. Locke,* 150 U. S. 193, 14 Sup. Ct. 78, where it was held that the mere incorporation of a pre-existing partnership, and a continuance of the same business by the same persons, though under the corporate form, did not involve any such transfer or assignment of assets as to terminate such a license. That case gives no support to the idea that the implied license to use patents belonging to the individual partners, held by the firm of J. S. Rowell Sons & Co., was a partnership asset which could have been sold to a stranger.

Turning to the record, we find undoubted support for the contention of appellants' counsel that many of the so-called expert witnesses who testified with reference to the good will in greater or less degree included in their conception of good will some or all of the elements criticised as above. Some of them valued that item upon the hypothesis that the outgoing partners could not or would not engage in a similar business; that the purchaser would be entitled to do business in the name of the old firm, using the name at least of *John S. Rowell* in so doing; and that such purchaser would be entitled to continue the use of any patented elements of the machines, so far as the same were important to their success; and upon cross-examination some of these witnesses said that, with these elements eliminated, the good will would not be a salable asset—as one or two put it, would be worth nothing because nobody would buy it. But both of these extreme statements were elucidated and modified upon the cross-examination. Witnesses pointed out those elements of the good will which might be of value even after the elimination of such things as could not have been sold to a stranger, among which, for instance, may be mentioned such things as the patterns, and a tiger head used as a trade-mark upon and designating the machines. On the part of appellants, several expert witnesses were called who testified generally that there was no good will to such a business, but they also were sub-

ject to a rigid cross-examination and elucidated the philosophy of their conclusions. Among the facts mentioned in the testimony of witnesses was the expense usually incurred by manufacturing concerns in placing themselves in relation with the trade, so that the annual expenses of finding customers would not absorb the returns from the sales, but would enable the doing of a profitable business. Certain witnesses testified that it was the result of their experience that in starting a new business at least two and perhaps three years' profits must be spent in this way, and that in buying an old established business that expenditure could be avoided. The valuation placed by these expert witnesses upon the good will of this business varied all the way from zero to $75,000, ostensibly modified, as we have stated, by cross-examination and by some measure of illumination as to the details of what the establishment of a good will would cost in a new business and what of such expenses might be avoided by the taking over of an old running concern. This was essentially a field for the balancing of a multitude of items of testimony and evidence. There is nothing to indicate that either the referee or the court applied wrong rules of law, unless it is the magnitude of the value fixed upon this good will. That those witnesses who testified there was no value whatever to the good will of this business if *John S. Rowell* and his sons could engage in the manufacture of similar implements, and advertise them to the trade under their own name, were wild of the fact we can have no doubt. There is one circumstance which is obvious, although not dwelt upon by either counsel, nor much referred to by the witnesses, which, to one at all familiar with an old, established manufacturing business, refutes any such opinion, and that is the retention of the assortment of extras and patterns which had been accumulated in this business through thirty years, accompanied by the records of the construction of the different machines at various times. It appears that almost yearly changes had been made

in the different machines, so that the parts being turned out in 1888, many of them, differed from those which had characterized the machines ten years earlier. Now, from 1855, more than forty years, *John S. Rowell* machines had been distributed through the country—in the later years, several thousand annually. It is apparent that the life of some of these machines was as much as twenty years. It is a well-known fact that the item of repairs in farm implements is a substantial one, and that, as those repairs would have to be manufactured specially by any one other than the dealer in the machines, at a much greater cost, the original manufacturer acquires substantially a monopoly of what is called the "repair business," and charges accordingly. That element of an old, established business has the largest per cent. of profit; and, the more of the product of the factory that is in use among the farmers, the more valuable is that trade. Obviously an establishment that had on hand an assortment of those extra parts, many of them not being made for new machines, and who also had the patterns from which could be produced parts of antiquated machines, would have a great and substantial advantage over any new establishment not so equipped, not only in the sale of the repairs themselves, but in the maintenance of relation with the former local selling agents, who, in order to maintain the confidence of the agricultural community about them, must be able promptly to supply broken and worn out parts of the machines which they had sold perhaps many years before. This equipment not only enabled the making of sales of the repairs in quantity and at profits to be attractive, but it gave an added facility in retaining the desirable selling agents through the country. This is but one item. Many others might be suggested, and for this purpose these patterns for some twenty-six different kinds of machines in process of manufacture in 1888, and for many parts formerly used, but meanwhile abandoned, were doubtless worth a large sum. For them nothing whatever

was paid by the surviving partners, nor allowed by the court, except as they were included in the allowance for good will, where certain of the witnesses located them.

After a careful examination and re-examination of all the testimony on this subject, the court is convinced that it cannot say either that the trial court adopted in its conception of the good will elements which could not have been conveyed to a stranger, nor that the amount finally found by the referee and approved by the trial court is in antagonism to that clear and undoubted preponderance of the evidence which is necessary to a reversal of the findings of trial courts upon questions of fact. The writer ventures, while intrusted with the duty of expressing the conclusions of the whole court, to say that, apart from the valuation of the patterns above mentioned, he could not reach the same conclusion, but would feel constrained to the view that the great preponderance of the evidence limited the value of the good will to approximately one third of the amount allowed. Such personal conviction must, however, yield to the view of his associates, and the conclusion of the court is that this item of allowance cannot be disturbed.

The next important attack made by appellants on the judgment is the inadequacy of the share of the profits realized after 1888, which was attributed to the exertions of those managing the business. The court recognized the principle that while surviving partners, in closing up the affairs of the firm, are not entitled to compensation for services, yet, when those interested in the estate elect to demand not only the fair value of their interest, but also a share in the profits earned by the use of the whole property, a court of equity will inquire to what extent the profits of the business are attributable to the personal services of those conducting it, and, if some share or sum is proved so to be with reasonable certainty, will allow that, on the theory that those who seek equity must accord it, also that profits due to such services

are not due to the property. This is, of course, subject to the consideration that they who have wrongfully appropriated property of another by mingling and confusing it with other things must bear the burden of proving with reasonable clearness and certainty what part of the ultimate general result is due to other sources than the misappropriated property. *Robinson v. Simmons,* 146 Mass. 167, 15 N. E. 558; *Griggs v. Clark,* 23 Cal. 427; *Painter v. Painter* (Cal.) 36 Pac. 865; 1 Perry, Trusts, § 430.

Pursuant to this principle, the court made an allowance to the three surviving partners of $19,733.32, in addition to the salaries which in the course of the business had been paid. Those salaries to all the stockholders amounted to $103,650, thus bringing the total allowance for services of those conducting the business up to $123,383. This sum approximates very closely to one third of the total net earnings, inclusive of such allowance, or one half of the amount of net profits remaining to be apportioned to the capital invested, which in the fourteen years have averaged approximately fifteen or sixteen per cent. per annum. After a careful examination of the evidence as to the course of this business, we are unable to conclude that the court's allowance was so seriously, if at all, inadequate as to justify a disturbance of it on appeal, though we might have felt no inclination to reduce it, had some moderately greater sum been allowed.

Another complaint made of the judgment by appellants is that it makes no allowance for the use of improvements covered by patents which did not belong to the old firm of J. S. Rowell Sons & Co., and the use of which has been valuable and productive of profit to the new concern. So far as these improvements have been the result of invention by *John S. Rowell* or his sons during the period since 1888, their benefit to the business has been considered and allowance therefor made in estimating the extent to which the services of these several men have contributed to the success of the business;

but, in addition to such inventions, there existed prior to 1888 two very important patents belonging to the *Rowells,* as to which the evidence is undisputed that the improvement patented has been of great value to the business, to such extent that royalties alone would amount to at least $1 for each machine in which either such improvement has been embodied. Those are patents numbered 10,076, on cultivator teeth, and 343,280, for interchangeable seeder and drill. The evidence and exhibits also disclose the number of machines which have been manufactured, embodying these improvements. We cannot avoid the conviction that recognition should be given to the fact that such machines could have been neither made nor sold with the economy or profits which have resulted, except by the use of these patents. No right to use them, transferable to a stranger, existed in the old partnership, as already stated; and to the extent, at least, of the mere royalty value, it seems certain that they have entered into and promoted the profits earned in the new business. It would perhaps have been entirely competent and possible for *Mr. Rowell* to have demanded reasonable royalties as a condition of allowing them to be used by the new corporation, but the fact that he had not done so, but, without charge, has permitted their enjoyment, supposing, however, that the benefit was inuring to himself and those on whom he chose to confer it, upon every principle of equity would require that, so far as the profits are due to these patents, he should not now be required to make payment to the plaintiffs. We shall not deem it necessary to state the detail of the evidence, further than that it establishes at least $1 per machine as a value to the business from the use of these patents, and that from October 1, 1888, onward, there have been manufactured and sold 9,900 of such machines. This sum ($9,900) should be deducted in ascertaining the amount of profits, as such, which have been realized by *Rowell* and his associates from the use of the entire capital of the corporation. In practical effect,

this would mean a deduction of 14.694 per cent. of the $9,900, or $1,454.60, with $25.45 interest, from the money judgment awarded to the plaintiffs.

We have now gone through all of the substantial errors which counsel for appellants have seen fit to urge. The record in the case is tremendously voluminous, and the errors, as suggested by the exceptions reserved below, are very numerous; but counsel has seen fit to confine himself to those which have now been discussed, and, as we understand him, has meant thereby to absolve the court from any duty to search this multitude of exceptions for other material errors. We have been very willing to accept this implied concession, and to refrain from an attempt to examine the many thousand manuscript pages of the record, except so far as they. relate to the particular errors assigned.

*By the Court.*—The judgment is modified by changing the amount awarded by the first paragraph thereof from $18,771 to $17,296.95, and, as so modified, is affirmed. Appellants to recover costs in this court; total allowance for printing to be limited to 200 pages.

CASSODAY, C. J. In this case I desire to add that I fully concur in the individual opinion of Mr. Justice DODGE, to the effect that the finding of the trial court as to the value of the good will should be greatly reduced.